ALFRED G. HOLCOMBE et al.

*v.*

TRENTON WHITE CITY COMPANY.

[Decided February 23d, 1912.]

1. When a corporation is insolvent the holders of its capital stock not paid for are obligated to pay so much of what is unpaid on the stock as will satisfy the claims of corporate creditors and meet the expenses of winding up its affairs.

2. The proper tribunal to ascertain the amount necessary for these purposes is a court of equity, as the courts of law have no procedure adapted to such a calculation; and the ascertainment may be made on a petition filed by the receiver against stockholders in the suit wherein the corporation was adjudged to be insolvent, for a stockholder is an integral part of the corporation.

3. When in such a proceeding an assessment on the stock has been ordered by the court of chancery to meet corporate liabilities, and an action is brought against a stockholder to collect his quota he cannot in the action at law question the propriety of the assessment.

4. In the absence of all of the directors of a corporation a quorum of

the board has no power to do corporate acts, unless notice of the time, place and object of the meeting was given to each and every member, including the absentees, or unless there be a standing rule fixing times for stated meetings, which operates as a constructive notice and is sufficient; or unless, further, a waiver of notice be signed by the absentees before the meeting. The reason is this: Each member of a corporate body has the right of consultation with the other members and has the right to be heard upon all questions considered, and it is presumed that if the absent members had been present they might have dissented and their arguments might have convinced the majority of the unwisdom of their proposed action, and thus have produced a different result. If, however, they had notice and failed to attend they waived their rights: likewise, if they signed a waiver of notice prior to the meeting; but consent given subsequent to the meeting looking to ratification of what was done, is without force to validate the action taken.

5. Where, however, capital stock of a corporation is issued under a resolution of the board of directors, which is invalid because passed at a meeting at which there were absentees who had no notice, nevertheless, acceptance of certificates of stock by the shareholders validates the action of the directors in that regard; and this is not dependent upon the doctrine of ratification, which, in turn, depends upon knowledge of all material facts, but upon the mere acceptance of the certificates of stock without paying for them; and such acceptance renders the holders liable without any formal subscription on their part.

6. Where solicitors for a corporation offered one share of common stock as a bonus with every two shares of preferred stock for which the public would subscribe, without any representation as to how the stock was to be issued, and such bonus shares were actually issued by and from the corporation and accepted by subscribers for preferred stock, such certificates constitute an original issue of corporate stock, notwithstanding the shares were first issued to promoters, as for property purchased, and by them turned back to the company for the purpose of being issued to such subscribers. And the holders of stock issued as a bonus are always required to pay for their shares to satisfy the claims of creditors.

7. Even the solemnly expressed judgment of the board of directors of a corporation cannot impart value to property which has no value; and neither bookkeeping nor mere recitative language in resolutions creating values can be accepted as the equivalent of proof of *bona fide* value required by the statute where stock is issued for property purchased.

8. A corporation may issue stock to the amount of the value of the property, but the value of the property must at least equal the face value of the stock.

9. The judgment of directors who are by law entrusted with the power to issue stock to the amount of the value of the property, and on whom, therefore, is placed the first duty of valuing, must be accorded considerable weight; but their judgment is not conclusive when subject to judicial scrutiny; nor is it necessary that conscious overvaluation or any other form of fraudulent conduct on the part of the directors should be shown to justify judicial interposition; their honest judgment,

if reached without due consideration into the elements of value, or if based in part upon an estimate of matters which really are not property, or if warped by self-interest, may lead to a violation of the rule for valuing as surely as would corrupt motive.

10. In a suit between *stockholders* it seems that after the stock has once been issued the holder shall not be liable for any further payment in the absence of actual fraud in the transaction; but this does not operate as against *creditors*, for when the rights of the *creditors* of an insolvent corporation intervene a different rule prevails.

11. Corporate stock issued, outstanding and unpaid for, is a trust fund for the benefit of creditors; and this doctrine is a hard and fast rule, which is never relaxed. In this state, however, the stockholder's liability to creditors no longer depends alone upon the trust fund theory, but is held to be statutory. And while an issue of bonus stock was formerly good as between the company and its stockholders under an agreement therefor, yet it is now held that these contracts are void, but it is also held that stockholders remain liable to a receiver for the benefit of *creditors*.

12. The provision in section 49 of the Corporation act that in the absence of actual fraud in the transaction the judgment of the directors as to the value of property purchased shall be conclusive, introduced no novelty into the law but was merely a declarative enactment of what was and had been the settled law and policy in this state.

13. The original issue of corporate stock is a special function, in the exercise of which the legislature has fixed a standard to be observed, and it is the duty of the courts, so far as their jurisdiction extends, to see that this standard is not violated either intentionally or unintentionally.

14. Neither stockholders nor directors have any right to make a present capitalization of prospective future profits of a corporation; and, consequently, they cannot issue capital stock therefor, as for property purchased.

15. In cases where stock is issued for property purchased our statute contemplates an actual appraisement of such property by the board of directors.

16. In an issue of corporate stock for property purchased, and property taken over at a grossly excessive value, the stockholders are, nevertheless, entitled to have credited to the payment for stock the just and fair value of the property conveyed to, and services rendered for, the company, and for which stock was issued, just as surely as they must be charged for the stock where value is absent.

17. Where a corporation takes over a lease by assignment the value of that lease to the corporation is its rental value for the outstanding, unexpired term, plus any other things of value to be received by the lessee under the lease.

18. Where directors of a corporation take over an unexpired lease but fail to appraise it according to its rental value, and give it a value in excess of what it actually has, their judgment will be reviewed by this court, which will exercise its judgment now as of the time when they should have acted, in substitution for the judgment they should have

formed; and the credit to be given the stockholders will be limited to the then fair value of the lease; that is, to its value as of the date and time when it should have been valued originally; neither subsequent success nor failure being permitted to operate in the forming of a *nunc pro tunc* judgment, for, while neither the hope and expectation of success can create property of that which is not property, equally the failure of those hopes and expectations cannot operate to destroy that which was and is property.

19. The stockholders of an insolvent corporation have an absolute right to the protection of whatever there was fairly, reasonably and honestly of value in the property at the time it was acquired, and any extremely low price brought by the property at the receiver's sale is no criterion of its value.

20. The true method of calculating the value of an unexpired lease is not by ascertaining the yearly rental value, and then multiplying the figures by the number of years the lease has to run, but by calculating its value by the annuity tables; that is, by multiplying the annual value by the value of one dollar per year for the number of years in the unexpired term.

21. While formerly subscriptions to capital stock could only be paid in money, stock is now issued for work and labor as well as for the purchase of property; but the cases in which such transactions are upheld are only those where the services rendered or property purchased are equal in value to the stock issued therefor.

22. Property is something to which the owner can have title. Title may be evidenced by an appropriate instrument. No instrument for the conveyance of things which are not property is known to the law, and none can be contrived.

23. Promoters of a corporation are obliged to select competent persons as directors—men who would act wholly in the interest of future stockholders, and who would not be biased or influenced by the persuasions of proposed vendors or by friendship for them—and to make to those directors a disclosure of all material facts; but where, however, the promoters are themselves directors and constitute a majority of the board, it is their duty to act as an independent board of directors with full knowledge would have acted, namely, to make a careful inventory and appraisement of all property to be purchased with stock or for cash, and to either issue stock or pay in cash, measure for measure—value for value.

24. In making an assessment against stockholders of an insolvent corporation it is the practice of this court, first, to ascertain the whole amount of the unpaid debts; second, in case of unpaid stock subscriptions or stock issued without payment, to determine the names of such stockholders and the amount due from each; and third, to make an assessment against those stockholders, which, in case an action at law is brought, based upon that assessment, is conclusive against the stockholders. In order to ascertain the whole amount of money necessary to be raised the receiver must compute the amount due on the several claims allowed by him and approved by this court by adding interest on each claim. To the sum of those must be added the cost of the solicitors for

the creditors in the proceeding to wind up the corporation and a reasonable counsel fee to complainant, to be fixed by the court on motion for that purpose; also, a round sum to cover the receiver's compensation and any further expenses which he may incur in the enforcement of the decree against the defendants held liable thereby. This last sum will be liable to reduction, according to the conduct of the defendants in resisting the enforcement of the decree.

25. This court has the power to continue a hearing and permit further and other proof to be taken, and that power ought to be exercised where it does not appear that injustice will be done, but where, on the contrary, justice requires it.

26. Promoters of an amusement company secured a lease for ten years upon a park, which lease contained a covenant on the part of the lessors that they would furnish certain arc lights for lighting the park during the term of the lease, and that they would sell to the lessee at any time during the term for a certain price. The promoters also negotiated with the builders of amusement devices for the erection and installation in the park of certain such devices, securing considerable reductions from the asking price therefor. They negotiated also with others for appliances and things requirable to equip the park as a going concern. They formed a corporation which took over the lease, installed the amusement devices (through purchases made of the manufacturers thereof), and utilized various other appliances and things negotiated for by the promoters. On the organization of the company the promoters were both stockholders and directors and, as such, passed omnibus resolutions reciting that the lease, devices and other things just mentioned were of the value of $79,000 to the company, and the company resolved to purchase the same from the promoters for $4,000 in cash and $75,000 in common capital stock. The company commenced business and prosecuted it for some time and then failed. A receiver was appointed by this court and he brought this suit to have an assessment made against the stockholders for such sums as will satisfy the claims of creditors—the assets coming to his hands being insufficient for the purpose. The stockholders defended and claimed that the things turned over to the company by the promoters, and for which stock was issued as for property purchased, were worth a greater sum than the cash and par of the stock given therefor. They adduced testimony tending to show that the leased premises were of a value largely in excess of the price for which the company could have purchased the premises in fee under the lease; also that the lighting contract contained in the lease was of very great value; also that large sums had been saved to the company through the negotiations of the promoters in securing reductions from the price of devices which were installed in the park.—*Held*, that the lease, including the lighting contract therein contained, was property turned over to the corporation, but that the basis of ascertaining the value of the lease was erroneous; that its true value is not the difference between what the company would have to give for the property, if it gave it, and the value of the property which it would get, if it got it (assuming there was such difference, great or small), but that its true value consisted of rental value, including the value of the lighting contract; that the sums said to have been saved to the company through the negotiations of the pro-

moters in securing reductions from the asking price for devices to be installed in the park, were not property at all, and, therefore, could not form the basis for an issue of stock as for property purchased under the statute; that for their services and expenses in promoting the company, securing its organization and starting it upon its career as a going concern, the promoters were entitled to reasonable compensation together with their expenses, and that payment therefor could be made in stock instead of cash.—*Held, further,* as there is no proof before the court of the rental value of the leased premises (there being, however, evidence as to the value of the arc lighting contract), and no evidence as to the reasonable value of the promoters' services, that, while an assessment will have to be made upon the stock issued as for property purchased, to satisfy the claims of creditors, the stockholders are, nevertheless, entitled to have credited on their shares the rental value of the leasehold, including lighting contract, and reasonable compensation for the services of the promoters, together with their expenses. The ascertainment of these values requiring further testimony, and the court having power to open the proofs and take testimony for such purpose, the proofs will be opened.

On application of receiver for assessment on capital stock for benefit of creditors.

*Mr. John H. Backes,* for the receiver.

*Mr. John M. Dickinson* and *Mr. Gilbert Collins,* for the stockholders.

WALKER, V. C.

Upon bill filed the defendant company was declared insolvent and Mr. Charles J. Fury was appointed its receiver. An order limiting creditors was made and filed and in due course claims were presented to the receiver amounting to $806.28 preferred, and $38,817.06 unpreferred, total, $39,623.34.

In pursuance of an order the receiver exposed for sale at public vendue the property of the defendant corporation consisting of the following:

"The lease of the lands and premises known as Capital City Park, consisting of 120 acres. (The rent on this lease is fully paid.)

"Carrousel, shute the shutes, concert hall, dancing pavilion, down and out, crystal maze, moving pictures, theatres, boating and numerous other amusement devices, including the buildings upon which the same are erected, together with all other personal property, as fully as the same

is described in an inventory filed by the said receiver in the office of the clerk of chancery, in a suit wherein Alfred G. Holcombe et al. are complainants and the Trenton White City Company is defendant."

In his report of sale the receiver stated that in addition to the usual notice required by law he caused to be posted in the city of Trenton and township of Hamilton (wherein the property was located) at least fifty other like notices; that in all one hundred posters were printed, and that those that were not posted were mailed to persons who were likely to be interested in property such as the receiver was about to sell, and also advertised the sale in the "Cincinnati Bill Board," "New York Dramatic Mirror," "New York Clipper," "New York Sunday Telegraph," "Trenton Sunday Advertiser" and "Trenton Evening Times;" that the first four papers are of extensive circulation in the theatrical profession and among amusement purveyors, such as the defendant company; that in the notice was published that the receiver asked for private bids, but received none such, and only received one inquiry concerning the sale as a result of the advertisements; that when the property was offered there was one bid for $100 and a second bid for $500, and, there being no contending bidders, he publicly adjourned the sale for one week, at which time there were two rival bidders, and that $2,075 was the highest bid offered, and for that much the property was struck off, and the sale afterwards confirmed, on notice to the creditors and stockholders.

After the sale the receiver filed a petition setting forth, among other things, that the defendant company was organized under our Corporation act (Revision of 1896) for the purpose of acquiring, constructing and operating grounds, parks or places of amusement and to equip the same with all necessary appliances and paraphernalia for operating and conducting games and amusements of all kinds whatever; and that the total authorized capital stock of the corporation was $150,000 divided into fifteen thousand shares of the par value of $10 each, of which seven thousand five hundred shares, amounting to $75,000, was to be preferred stock, and seven thousand five hundred shares, amounting to $75,000, was to be common stock; that the holders of the preferred stock should be entitled to receive a certain dividend

before any dividend on the common stock should be paid, and that in the event of liquidation or dissolution the holders of the preferred stock should be paid at par before any amount should be paid to the holders of the common stock; that certain persons, naming them, subscribed for certain shares of the common stock of the corporation, whereby they became liable to pay for the same, at par, but have not done so, notwithstanding demands by the receiver, and he prayed that an assessment be levied against the persons so subscribing, respectively, for the full amount of the common stock so issued to them, or for such other sum as might be sufficient to enable him to pay the debts of the defendant corporation and liquidate its affairs.

Upon the filing of this petition an order was made requiring the persons shown to be stockholders to show cause on a certain day why the prayer of the petition should not be granted, and afterwards a trial was had in this court upon the question presented by the petition.

This proceeding instituted by the receiver is in accordance with the practice which was established in *Cumberland Lumber Co.* v. *Clinton Hill Lumber Manufacturing Co.,* 57 *N. J. Eq.* (*12 Dick.*) *627,* wherein the court of errors and appeals, speaking by Mr. Justice Dixon (at *p. 629*), said:

"When the business of a corporation has been abandoned and the corporation is insolvent, subscribers for or holders of its stock, not paid for, have no further obligation with respect thereto than to pay so much of what is unpaid on the stock as will satisfy the claims of corporate creditors and meet the expenses of winding up its affairs.   *Scovill* v. *Thayer, 105 U. S. 143, 156; Wetherbee* v. *Baker, 8 Stew. 501, 506; Hood* v. *McNaughton, 25 Vr. 425, 427; Gen. Stat. p. 910 § 5; P. L. 1896 p. 284 § 21.*

"The proper tribunal to ascertain the amount necessary for these purposes is a court of equity, since courts of law have no procedure adapted to the marshaling of assets and liabilities requisite in such a calculation.   The ascertainment may be made on a petition filed by the receiver against the stockholders in the suit wherein the corporation was adjudged to be insolvent, for it seems to be settled that a stockholder is so far an integral part

of the corporation that, in the view of the law, he is to that extent privy to those proceedings; and when in such a suit an assessment on the stock has been ordered by the court to meet corporate liabilities, and an action is brought against a stockholder to collect his quota, he cannot there question the propriety of the assessment. *Hawkins* v. *Glenn, 131 U. S. 319; Hood* v. *McNaughton, 25 Vr. 425.*"

Preferred stock was issued and paid for in cash at par. All of the common stock was issued to the promoters—Messrs. W. Meredith Dickinson, John S. Broughton, Barker G. Hamill, Wilbur F. Sadler, Jr., and Christian H. Oberheide—and was by them returned to the treasury of the company to be used and distributed as a bonus to the subscribers for the preferred stock in the ratio of one share of common stock for every two shares of preferred stock. The common stock was accordingly issued, and now those stockholders in virtue of their possession of the certificates, unpaid for, are asked to respond.

At the corporation's organization meeting Messrs. W. Meredith Dickinson, John S. Broughton, Barker G. Hamill, John M. Dickinson, Wilbur F. Sadler, Jr., and F. W. Roebling, Jr., were elected directors. Action was then taken with reference to the issuance of stock, as shown by the minutes as follows:

"WHEREAS Barker G. Hamill, John S. Broughton, W. Meredith Dickinson, Wilbur F. Sadler, Jr., and C. H. Oberheide own and control a certain leasehold in and to a certain large tract of land and premises in the township of Hamilton and county of Mercer, commonly known as Broad Street Park, in which lease there is an unexpired term of four years; and whereas said persons above named also control an option upon said property to lease the same for an additional period of six years from the time of the expiration of the term of their present lease aforesaid; and whereas said persons have entered into various contracts with certain persons, firms and corporations for the construction and erection of various devices which would be useful and necessary in the operation and conduct of the business of this company; and whereas it appears to the stockholders that such property rights and interest would be of great value to this company, and that their acquisition is indispensable to the successful operation of this company, and the conduct of its business, and that no other property rights and interests of a similar nature and character can be acquired by this company which would be of equal value to it; and whereas the said Barker G. Hamill, John S. Broughton, W. Meredith Dickinson, Wilbur F. Sadler, Jr., and C. H. Oberheide have offered to sell said property interests and contract rights to this com-

pany for the sum of four thousand dollars in cash and in consideration of the issue of· the common stock of this company to them to the amount of seventy-five thousand dollars, par value;

"*Now, therefore, be it resolved,* that the board of directors of this company be and they are hereby authorized in their discretion to purchase the property, leasehold interests and contract rights above mentioned, for the price aforesaid, and to issue said stock in payment therefor.

"Upon motion duly made and seconded, and by the affirmative vote of all present, the following preamble and resolution was unanimously adopted:

"WHEREAS it has been agreed between each of the incorporators and Barker G. Hamill, John S. Broughton, W. Meredith Dickinson, Wilbur F. Sadler, Jr., and C. H. Oberheide that the stock to be issued in payment for the property authorized to be purchased by the resolution above set forth shall include the stock subscribed by the incorporators, as evidenced by the certificate of incorporation;

"*Now, therefore, be it resolved,* that the· board of directors be and they are hereby authorized and directed to accept said property as full payment for the subscription for stock of the incorporators, and to issue full paid stock to the incorporators or their assigns to the amount of their respective subscriptions."

A meeting of the board of directors was held on the adjournment of the stockholders' meeting. There were present Messrs. John S. Broughton, Barker G. Hamill, John M. Dickinson, W. Meredith Dickinson and C. H. Oberheide. Messrs. Sadler and Roebling were absent. In the minute book, at the end of the minutes of the directors' meeting, is a waiver of notice of the time and place of, and of the business to be transacted at the meeting. This is signed by all of the directors, including the absentees, and bears date the day of the meeting, namely, March 26th, 1907. It appears, however, that the absent directors had no notice of the meeting, and that they appended their signatures to the waiver afterwards. At this meeting the following action was taken:

"On motion duly made and seconded, it was·unanimously resolved that this company accept the offer of Barker G. Hamill, John S. Broughton, W. Meredith Dickinson, Wilbur· F. Sadler, Jr., and C. H. Oberheide, to sell and assign to this company the property described in the resolution of the stockholders passed at the first meeting of the corporation, consisting of property rights, leasehold interests, and contract rights, said board of directors do hereby adjudge and declare that said property rights and interests are of the fair value of seventy-nine thousand dollars, and that the same are necessary and indispensable for the conduct of the business of this company;

"And be it further resolved that the president. and secretary of the company be and they are hereby authorized to execute any and all agreements on behalf of this company, for the acquisition of said property rights, leasehold interests and contracts, and to issue to the said Barker G. Hamill, John S. Broughton, W. Meredith Dickinson, Wilbur F. Sadler, Jr., and C. H. Oberheide, or their assigns, certificates of full paid common capital stock of this company to the amount of $75,000, par value, and to pay to them in cash, in addition thereto, the sum of $4,000.

"On motion it was ordered that an assessment of one hundred per cent. be issued upon the shares of stock subscribed by the incorporators, as evidenced by the certificates of incorporation.

"On motion, it was further resolved that in compliance with the resolution of the stockholders passed at the first meeting of the corporation, the company accept in payment of said subscriptions and assessments the property agreed to be sold to the company, as set forth in the preceding resolution."

The first contention made on behalf of the receiver is that in the absence of all of the directors a quorum of the board of the White City Company had no power to pass the resolution just recited unless notice of the time, place and object of the meeting was given to each and every member, including the absentees; or unless the waiver of notice was signed by the absentees at or before the meeting, and that the resolution passed at the meeting held is inefficacious to protect the defendants as holders of stock issued for property purchased. To this I agree.

The supreme court, in *State* v. *Ferguson, 31 N. J. Law (2 Vr.) 107, 124,* held:

"All the members must be summoned. And in this case the fifth man was not present nor was he notified of the meeting. The rule that all the members of the corporate body, or of a branch of a corporate body, who discharge special functions for the society, who have the right to consult and to vote, must be notified in some form to attend the meetings of the body to which they belong, is too familiar to require much reference to authorities in its support. See *Grant Corp. 156, 157, 158.*"

And in *Metropolitan Telephone Co.* v. *Domestic Telegraph Co., 44 N. J. Eq. (17 Stew.) 568,* Mr. Justice Magie (afterwards chancellor) said (at *p. 573*):

"When power is given to be exercised, in the absence of a rule requiring the concurrence of a definite number, a majority of a quorum duly convened may act. *Wells* v. *Rahway W. R. Co.,*

*4 C. E. Gr. 402; Cadmus* v. *Farr, 18 Vr. 208; Barnet* v. *Paterson, 19 Vr. 395.* But since each is entitled to take part in the exercise of the power, each is entitled to notice. Notice may be given by the adoption of rules fixing times for stated meetings; constructive notice will be sufficient if some rule, legally prescribed, declares it sufficient; but for special meetings, in the absence of a rule for constructive notice, actual notice must be given. In the absence of such notice, a special meeting will not be legally convened. These rules apply to the corporators of incorporated companies, the directors and any committee thereof. *Green Br. U. V. 438 and notes; Ang. & A. Corp.* § *492; Reeves* v. *Ferguson, 2 Vr. 107.*"

This court, in *Schumm* v. *Seymour, 24 N. J. Eq. (9 C. E. Gr.) 143,* held:

"The affairs of a corporate body can be transacted only at a corporate meeting. Its legislative and discretionary powers can be exercised only by the coming together of the members who compose it; and its purposes or will can be expressed only by a vote embodied in some distinct and definite form. Their only existence is as a board, and they can do no valid act except as a board, and such act must be by ordinance or resolution, or something equivalent thereto." See, also, *Dey* v. *Mayor, &c., 19 N. J. Eq. (4 C. E. Gr.) 412; Johnston* v. *Jones, 23 N. J. Eq. (8 C. E. Gr.) 216; Holcomb's Executors* v. *Managers, 9 N. J. Eq. (1 Stock.) 457.*

In *Whitehead* v. *Hamilton Rubber Co., 52 N. J. Eq. (7 Dick.) 78,* this court held:

"The presumption that an instrument to which the seal of a corporation is duly attached was first authorized by the corporation, is overcome by proof that the authority for the execution of such instrument was given at a special meeting of the directors, at which all were not present, there being no proof that the absent ones had any notice of such meeting; nor will the necessity of such notice be dispensed with by showing that the meeting was an adjourned meeting, the previous one having been a special meeting, without also showing that there was notice of such first special meeting, and that the object of it was made known in the notice, or that the directors, absent at the adjourned meeting,

were present at the time of the adjournment, and that the question to be determined at such adjourned meeting was made known as the object of such adjournment."

The reason and principle underlying these decisions is this: Each member of a corporate body has the right of consultation with the others and has the right to be heard upon all questions considered, and it is presumed that if the absent members had been present they might have dissented and their arguments might have convinced the majority of the unwisdom of their proposed action, and thus have produced a different result. If, however, they had notice and failed to attend they waived their rights; likewise if they signed a waiver of notice prior to the meeting; but consent given subsequent to the meeting looking to ratification of what was done, is without force to validate the action taken.

I am, therefore, required to decide that the action of the board of directors of the defendant company, in ordering the issuance of the common stock, was null and void. Nevertheless, the stock issued is not invalid, because that issue was validated by the stockholders. This the stockholders had a right to do, at least so far forth as to render the stock an asset for the benefit of creditors in case of insolvency.

Invalid action by a corporation in reference to third parties may be validated by the acts of those parties. This, in reference to stock issues does not depend upon the doctrine of ratification, which, in turn, depends upon knowledge of all material facts, but upon acceptance of the certificates of stock. This is familiar doctrine. Suppose stock were authorized to be issued and sold at par for cash by the resolution of a board of directors which was void, if the stock were actually issued by the officers of the company and paid for by the subscribers to whom certificates were delivered, of course that would amount to a validation by the stockholders, and the company would be estopped from denying the validity of the shares on the ground of its invalid action in issuing them. A corporation, like an individual, cannot receive the benefit of a transaction and repudiate its obligation under it. And it has been held heretofore that an issue of bonus or unpaid for stock was good as

between the company and its stockholders in accordance with their agreement (*Hebberd* v. *Southwestern Land and Cattle Co., 55 N. J. Eq.* (*10 Dick.*) *18, 31*); yet it has since been decided that these contracts are not only voidable but void, and cannot be laid hold of by either party, company or stockholders, as a ground of action or defence. *Easton National Bank* v. *American Brick Co., 70 N. J. Eq.* (*4 Robb.*) *722, 728.* Notwithstanding this, the stockholders still remain liable to a receiver for the benefit of *creditors,* as was expressly declared by the court of errors and appeals in the very case (*Easton National Bank* v. *American Brick Co., supra*) which held the contract void as between the company and the stockholders.

In *Clevenger* v. *Moore, 71 N. J. Law* (*42 Vr.*) *148, 151,* it was held, that a person might become liable as a stockholder without a formal subscription, or where it is irregular, and this even where the certificates were attested by the secretary instead of by the treasurer as the law requires, and that irregularity does not relieve the defendant's responsibility as a shareholder.

Mere acceptance of a certificate of stock without paying for it renders the holder liable without any formal subscription on his part.    *See* v. *Heppenheimer, 69 N. J. Eq.* (*3 Robb.*) *36,* bottom of *p. 57* and top of *p. 58.*

As above remarked, holders of bonus' stock are always required to pay for their shares to satisfy the claims of creditors. Chancellor McGill, in *Hebberd* v. *Southwestern Land and Cattle Co., 55 N. J. Eq.* (*10 Dick.*) *18* (at *p. 31*), speaking to the subject, said:

"As to the bonus stock, the contract between the purchaser of bonds and the company was that he should not be called upon to pay for the stock.    Such a contract is binding upon the company and its shareholders, but as the capital stock constitutes a trust fund for the payment of debts, it cannot be given away from the demands of creditors, and hence the holders of bonus stock may be required to pay for it in satisfaction of the demands of creditors, after the exhaustion of all other assets, upon the ground that its issuance to them was a fraud in

law upon the creditors. *Richardson* v. *Green, 133 U. S. 30; Handley* v. *Stutz, 139 U. S. 417."*

The stock under consideration, being valid at the suit of the receiver in behalf of creditors, against the persons who received the shares, notwithstanding irregularity in the issue, makes necessary the decision of another and more important question involved in this case, namely, whether or not the shareholders, on the facts present before me, are liable to pay for their shares, in whole. or in part, to satisfy the claims of the creditors of the insolvent corporation.

It will be remembered that the total claims presented to and allowed by the receiver amount to the sum of $39,623.34, practically $40,000, and that the total, par value, of the common stock issued and outstanding in the names and possession of the various stockholders amounts to the sum of $75,000.

Our Corporation act provides in section 48:

"Nothing but money shall be considered as payment of any part of the capital stock of any corporation organized under this act, except as hereinafter provided in case of the purchase of property."

And in section 49:

"Any corporation * * * may purchase * * * property necessary for its business, and issue stock to the amount of the value thereof in payment therefor, and the stock so issued shall be full paid stock and not liable to any further call, neither shall the holder thereof be liable for any further payment under any of the provisions of this act; and in the absence of actual fraud in the transaction, the judgment of the directors as to the value of the property purchased shall be conclusive."

It must be apparent, however, even to the casual observer, that a solemnly expressed judgment of the board of directors of a corporation cannot impart value to property which has no value. This has been decided so many times as to have become axiomatic. An apt illustration by the court of errors and appeals is to be found in *Knickerbocker Imp. Co.* v. *Board of Assessors, 74 N. J. Law (45 Vr.) 583, 588,* wherein it was remarked by Judge Dill, as follows:

"Neither bookkeeping nor mere recitative language in resolutions of a board of directors creating values can be accepted as

the equivalent of the proof of *bona fide* value required by our statute where stock is issued for property purchased."

As already shown, the stockholders and directors by formal ɪesolution authorized the purchase of property at a valuation of $75,000 in the common stock of the company. The directors in the resolution declared that the

"property rights, leasehold interest, and contract rights, said board of directors do hereby adjudge and declare that said property rights and interest are of the fair value of $79,000, and that the same are necessary and indispensable for the conduct of the business of this company."

This language is very like that which was reprobated by the court of errors and appeals in *Knickerbocker Imp. Co.* v. *Board of Assessors, supra* (at *p. 587*), where Judge Dill further said:

"The property is described as 'the rights and everything' of the Cazanove Champagne Company. There is no other description of the property or competent proof of its tangibility or value.

"The allegations of assumption of liability by the prosecutor are not evidence and are of no assistance in determining the actual value received, because there is no proof as to the extent or substantiability of the liability."

Speaking of sections 48 and 49 of the Corporation act the court of errors and appeals, in *Donald* v. *American Smelting and Refining Co., 62 N. J. Eq. (17 Dick.) 729, 731,* said:

"The meaning of section 48 is not questionable. The money must equal the face value of the stock. The language of section 49 is even more explicit. The corporation may issue stock to the amount of the value of the property. The value of the property in the one case, just as the value of the money in the other, must at least equal the face value of the stock. Such was the view expressed for this court by Mr. Justice Depue in *Wetherbee* v. *Baker, 8 Stew. 501,* and supported by abundance of authority.

"The distinction between the contemplated issue of corporate stock for property and its issue for money lies, not in the rule for valuation, but in the fact that different estimates may be formed of the value of property. When such differences are

brought before judicial tribunals, the judgment of those who are by law entrusted with the power of issuing stock 'to the amount of the value of the property,' and on whom, therefore, is placed the first duty of valuing property, must be accorded considerable weight, but it cannot be deemed conclusive when duly subjected to judicial scrutiny. Nor is it necessary that conscious overvaluation or any other form of fraudulent conduct on the part of these primary valuers should be shown to justify judicial interposition. Their honest judgment, if reached without due examination into the elements of value, or if based in part upon an estimate of matters which really are not property, or if plainly warped by self-interest, may lead to a violation of this statutory rule as surely as would corrupt motive. * * *

"When corporate stock has once been issued for property purchased, then the legislature has directed the application of a different rule. . In the words of the same section 49, 'the stock so issued shall be full paid stock, and not liable to any further call, neither shall the holder thereof be liable for any further payment under the provisions of this act; and in the absence of actual fraud in the transaction the judgment of the directors as to the value of the property purchased shall be conclusive.'

"Under these provisions, after the property has been purchased and the stock issued therefor, nothing short of actual fraud in the transaction can impair the right of the holder to hold his stock as full paid stock free from further call. The cases of *Bickley* v. *Schlag, 1 Dick. 533*, and *Rural Homestead Co.* v. *Wildes, 9 Dick. 668*, indicate that the completed transaction was equally secure, even before the statute received its present decisive form.

"By the rule above stated, the matter in hand must be judged."

*Donald* v. *American Smelting and Refining Co., supra*, was a suit between stockholders, and, therefore, one in which the observation of Mr. Justice Dixon to the effect that after the stock has once been issued the holder shall not be liable for any further payment in the absence of actual fraud in the transaction, cannot have the effect of overruling, as against creditors, what he had just said about the value of property pur-

chased equaling the face value of the stock, his language be-
ing "the value of the property in the one case, just as the
value of the money in the other, must at least equal the face
value of the stock." As we have already seen an issue of bonus
stock was formerly good as against the company. *Hebberd* v.
*S. L. & C. Co., ubi supra.* But even then where the rights of
*creditors* intervene a different rule prevailed.

Commenting upon Mr. Justice Dixon's assertion that after
the stock has issued (in a suit between *stockholders*) a different
rule prevails, Vice-Chancellor Pitney, in *See* v. *Heppenheimer,*
*supra* (at *p. 56*), remarks as follows:

"The learned judge, however, in *Donald* v. *American Smelting
Co., supra,* after using the language above quoted, proceeds to ex-
press some thoughts, which so far as I can perceive, are not
necessary to the decision of the cause, and so necessarily in the
nature, at best, of *obiter dicta,* and therefore not binding upon
me.

"I venture to suggest that their object was to show the effect
of stock once issued coming into the hands of a *bona fide* pur-
chaser. They certainly have no application to the present case
in which creditors are suing.

"They are, however, relied upon by the defendants and are as
follows:

" 'When corporate stock has once been issued for property
purchased, then the legislature has directed the application of a
different rule. In the words of the same section 49, the stock so
issued shall be full paid stock, and not liable to any further call,
*neither shall the holder thereof be liable for any further payment
under the provisions of this act;* and in the absence of actual
fraud in the transaction the judgment of the directors as to the
value of the property purchased shall be conclusive.' (This last
clause is not found in the act governing the transaction here in
question.)

" 'Under these provisions, after the property has been pur-
chased and the stock issued therefor, nothing short of *actual
fraud* in the transaction can impair the right of the holder to
hold his stock as full paid stock, free from further call.'

"As applied to the case then before the court of errors and ap-

peals, I understand that language as holding that if the stock, the issue of which was sought to be restrained, should be issued with the words 'issued for property purchased' printed on the certificate, it would not be competent for the company to deny the validity of the stock and the rights of the holders of the certificates on the ground that the property had been overvalued, unless there was fraud practiced by the vendor on the vendee.

"He did not have in mind the case of creditors. (And see the language of Mr. Justice Brown in *Handley* v. *Stutz, 139 U. S. 417* (at *p. 426.*)

"Moreover, the construction of that language claimed by defendants would result in a practical nullification of the section of the act first above quoted, which declares the liability to creditors of stockholders who have not paid in the amount of their stock, or have paid for it in property at an overvaluation, since·it is entirely practicable to purchase the property and issue the stock in a single transaction and before any creditors exist or any judicial interference can be made. In short, the construction claimed would run directly counter to the carefully prepared opinion of Mr. Justice Depue, in *Wetherbee* v. *Baker, 35 N. J. Eq.* (*8 Stew.*) *501* (at *p. 511 et seq.*), relied on by the learned judge in his opinion here in question."

But, after all, the observation of Mr. Justice Dixon in *Donald* v. *American Smelting and Refining Co.,* just adverted to, was predicated upon the cases of *Bickley* v. *Schlag, 46 N. J. Eq.* (*1 Dick.*) *533,* and *Rural Homestead Co.* v. *Wildes, 54 N. J. Eq.* (*9 Dick.*) *668,* which he cited in support of his assertion or *dictum. Bickley* v. *Schlag,* upon inspection, will be found to be a case in which the property purchased by stock bore a very considerable resemblance in value to the face of the stock. It was a creditors' suit and stock was issued of the value of $75,000 for property worth $64,000, leaving a balance of only $11,000 unpaid for. *Rural Homestead Co.* v. *Wildes* was not a creditors' suit, but was one between stockholders, just as *Donald* v. *American Smelting Co.* was, and did not at all involve the question here under discussion; and this case makes it apparent that in that class of suits, namely, those between stockholders of going concerns, a

different rule prevails than in cases of insolvent corporations where the rights of *creditors* intervene.

The doctrine that corporate stock issued, outstanding and unpaid for, is a trust fund for the benefit of creditors, is a hard and fast rule imbedded in the decisions of the courts of this and other states, and is never relaxed. In this state, however, the stockholder's liability to creditors no longer depends alone upon the trust fund theory, but is held to be statutory. *Easton National Bank* v. *American Brick Co., 70 N. J. Eq. (4 Robb.) 732.*

I must agree with the proposition of counsel for the receiver that the provision in the Corporation act (*Rev. 1896* § *49*), which provides that "in the absence of actual fraud in the transaction, the judgment of the directors as to the value of the property purchased shall be conclusive," introduced no novelty into the law, but is simply declaratory of the law.

The case of *Donald* v. *American Smelting and Refining Co., supra,* was decided in this court by Vice-Chancellor Stevens (*61 N. J. Eq. (16 Dick.) 458*), who (at *p. 461*) adverted to the fact that the provisions that in the absence of actual fraud the judgment of the directors as to value should be conclusive, appears for the first time in the act of 1896, and was omitted from the act of 1875, and he observes (at *p. 463*) that it is quite apparent that the intention of the revisers of the act of 1896 was to put in statutory form the result (in this regard) of prior adjudications. One of the cases cited by him in support of this view is *Bickley* v. *Schlag (Court of Errors and Appeals, 1890), 46 N. J. Eq. (1 Dick.) 534,* wherein Chief-Justice Beasley said (at *p. 536,* quoting from *Coit* v. *Gold Amalgamating Co., 119 U. S. 345*) :

"Where full paid stock is issued for property received, there must be actual fraud in the transaction to enable creditors of the corporation to call the stockholders to account."

And as was remarked by Vice-Chancellor Bergen in *Easton National Bank* v. *American Brick and Tile Co., 69 N. J. Eq. (3 Robb.) 326* (at *p. 329*) :

"It will be observed that this differs from the law of 1896, in that the latter act * * * makes the judgment of the directors conclusive as to value in the absence of actual fraud. * * *

This change has no other effect than expressing what our courts had already determined in construing the earlier legislation."

Thus it appears that that provision in the Revision of 1896 is merely a declarative enactment of what was and had been the settled law and policy of this state.

But, after all, the case under consideration is controlled absolutely by the decision in *See* v. *Heppenheimer, supra,* rendered in 1905. In that case the defendants were adjudged to be responsible in favor of creditors, in enormous sums for stock issued as for property purchased and given as a bonus, and the learned judge who wrote the opinion so clearly showed that he was simply enforcing the settled law of the state that the defendants apparently did not think it worth their while to appeal, and no appeal was taken. That case governs this court and is binding upon me.

Although it has not passed under review in the court of errors and appeals (because not carried up, as stated), *See* v. *Heppenheimer* has, nevertheless, been cited with approval repeatedly by this court, the court of errors and appeals and the supreme court. See *Easton National Bank* v. *American Brick Co. (Court of Errors and Appeals, 1905), 70 N. J. Eq. (4 Robb.) 722, 727; Bigelow* v. *Old Dominion Copper Co. (Court of Chancery, 1908), 74 N. J. Eq. (4 Buch.) 457, 496; Johnson* v. *Tennessee Oil Co. (Court of Chancery, 1909), 75 N. J. Eq. (5 Buch.) 314, 318; Jackson* v. *Hooper (Court of Errors and Appeals, 1909), 76 N. J. Eq. (6 Buch.) 592, 604; Strickland* v. *National Salt Co. (Court of Chancery, 1910), 77 N. J. Eq. (7 Buch.) 328, 335; Gilson* v. *Appleby, 78 N. J. Eq. (8 Buch.) 96.*

I said that the case before me was governed by *See* v. *Heppenheimer,* but before proceeding to draw the parallel I desire to say that I acquit the gentlemen who composed the board of directors of the White City Company, and who were its promoters, of any charge of actual wrong-doing or fraud. They did not conceive a scheme to filch the public. Far from it. They promoted and organized a company which they believed would be a highly successful enterprise and one profitable to everybody interested in it.

In thus absolving them I am but following the precedent set by eminent English judges; for *In re Eddystone Marine Insurance Co. (1893), 3 Ch. Div. 9,* Mr. Justice Wright made the following

observation: "Before dealing with those questions (concerning liability for shares of bonus stock), I desire to say that I think the conduct of Messrs. Greenway, and all of the other gentlemen concerned, is entirely free from any shadow of blame or impropriety. They acted with perfect honesty and they took every means in their power to prevent creditors, or persons dealing with the company, from being in any way misled," and in this he was very pointedly endorsed by Lord Justice James, on appeal (at *p. 17*), who said:

"This case. is in some respects a hard one on these gentlemen, because I quite agree with Mr. Justice Wright that everything that has been done in this case has been done openly and honestly and *bona fide.* There is no attempt to conceal or to take anybody in or anything of the kind. But the question is whether what has been done is authorized by the acts of parliament which relate to limited companies."

It may be asked then, why are stockholders held liable in these cases? The answer is that their liability is a legal one, imbedded in the acts of the legislature and the uniform decisions of the courts.

In *See* v. *Heppenheimer, supra,* the defendant stockholders set up that it did not appear that the creditors, or any of them, relied upon the fact that the amount of capital stock had been paid in, but Vice-Chancellor Pitney (at *p. 84*) brushed all this aside, saying:

"I am unable to see the least force in this defence. It has not the least foundation in our statute nor in the decision or *dictum* of any court in this state.

"The scheme of our legislative policy in that respect is that all creditors shall stand on an even footing. * * *

"These records (certificate of organization, &c., in secretary of state's office) are public records and are made so for the benefit of the public, and particularly for the information of creditors.

"The true rule, in my judgment, is, that in the absence of any proof on the subject, which is the case here, the creditors are presumed to have acted upon the information of these records."

Here is an intimation that the creditors might be excluded from relief against the stockholders if it does not appear that they

relied on the payment of the capital stock in extending credit, upon the theory that the liability of the stockholders rested upon the company's having held out the capital stock as a source from which payment might be expected by creditors. But the court of errors and appeals, in *Easton National Bank* v. *American Brick Co., 70 N. J. Eq.* (*4 Robb.*) *732*, goes a step further than does Vice-Chancellor Pitney, and holds (at *p. 739*) :

"But in this state the stockholder's liability to creditors does not depend alone or chiefly upon the theory of 'holding out.' It depends upon the stockholder's voluntary acceptance, for consideration touching his own interest, of a statutory scheme to which watered stock, under whatever device issued, is absolutely alien, and which requires stock subscriptions to be made good for the benefit of creditors of insolvent companies, without distinction between prior and subsequent creditors, or between creditors who had notice and those who had none."

The directors of the White City Company, in their zeal and enthusiasm, mistaking the law and misjudging the facts, resolved upon the issuing of bonus stock, as for property purchased, believing that what they assumed to take over had a value which they could capitalize. How far they were right, and how far wrong, will hereafter be made to appear.

Other conduct besides that of deliberate fraud on the part of directors will render stockholders liable for holdings of unpaid stock. Said Mr. Justice Dixon, in *Donald* v. *American Smelting Co., supra* (at *pp. 731, 732*) :

"Their [directors'] honest judgment, if reached *without due examination into the elements of value, or if based in part upon an estimate of matters which really are not property,* \* \* \* may lead to a violation of the statutory rule as *surely as would corrupt motive.* \* \* \*

"But the original issue of corporate stock is a special function, in the exercise of which the legislature has fixed a standard to be observed, and it is the duty of the courts, so far as their jurisdiction extends, to see that this standard is not violated either intentionally or unintentionally."

At this juncture it may be opportune to notice a contention made on behalf of the stockholders. It was that they did not

stand upon the footing of original subscribers, but that they were assignees of the promoters to whom the stock was first issued. This position is misconceived.

True, stock was first issued to the promoters, but it was by them turned back to the company, and the shares of those now sought to be held liable were issued directly to them from the company without the intervention of any certificates issued to stockholders who assigned to them, and by them turned in for new certificates. Besides, there was no bargain and sale to them of shares by existing stockholders, but, instead, a representation was made to them by solicitors for the company that they would receive one share of common stock as a bonus with every two shares of preferred stock for which they would subscribe, without any representation having been made as to how the stock was to be issued.

Now, as to the proceedings of the stockholders and directors in issuing the stock.

In *See* v. *Heppenheimer* (at *p. 66*), Vice-Chancellor Pitney said:

"This proposition [of the promoters] was immediately considered at the stockholders' meeting and accepted by a series of resolutions which had already been prepared by Mr. Samuel Untermeyer, who was present and directed the whole proceeding. * * *

"In point of fact, it is not disputed that the stockholders and directors [the same persons] acted upon the strength of the reliability and truthfulness of the rose-colored prospectus previously prepared by Mr. Untermeyer, by which he showed that the mills, by the establishment of a monopoly, would be able to earn six per cent. interest on their mortgage debt, one per cent. additional for a sinking fund, eight per cent. on the preferred stock, and at least fifteen per cent. on their common stock.

"In short, the principal item in the valuation of the property consisted in a present capitalization of the prospective profits due to a monopoly of the wrapping paper trade."

Just so in the case under consideration, the proposition for the sale of what was called property and the acceptance of common capital stock in payment therefor was embodied in resolutions

adopted by the stockholders and directors, which had already been prepared; and, as in *See* v. *Heppenheimer*, the principal item in the valuation of the property must have consisted in the then present capitalization of the prospective or future profits of the company. But this did not constitute property, as we shall presently see.

In *See* v. *Heppenheimer* (at *p. 43*), Vice-Chancellor Pitney said:

"There the word 'property' must evidently be construed by its context which refers to something visible and tangible and necessary for the business, and the amount of stock to be issued therefor is limited to the value thereof—that is, to the value of that *property*.

"If the question above put be the true one, it seems to me that it answers itself, and adversely to the contention of counsel of defendants.

"But the defendants attempt to sustain their valuation in question on two grounds:

"*First*. That the valuation was made in perfectly good faith and without any fraudulent intent; and that fraud is, by the rule to be applied here, a necessary ingredient of overvaluation; and

"*Second*. That the increased valuation in this case may be justified by, and attributed to, the item of '*good will*.'

"The reply of counsel for complainant to the point of good faith and absence of fraud is twofold.

"*First*. That these elements have no place in a transaction of this kind where the thing valued is not, properly speaking, property; and

"*Second*. That the good faith and absence of fraud set up by the defendants will not stand the test of close scrutiny, and, further, that the circumstances of the case, given with great detail in the evidence, show that there was no actual appraisement of the property by a competent board of directors such as is contemplated by the statute."

And (at *p. 46*):

"The present case is a painful illustration of the utter impossibility of giving the word 'property' the construction claimed for it.

"The rose-colored future [presently to be stated at length] for this enterprise, created with so much confidence by its promoters, failed entirely in the face of actual experience."

And (at *p. 37*) :

"Now, all these elements enter into the usual uncertainties and contingencies of business which should have been anticipated by the promoters in the estimate of the prospective profits of this enterprise, even if it were at all lawful to consider those profits."

In the case in hand, there was no actual appraisement of the property by the board of directors as contemplated by the statute. The property taken over, as certified in the resolution, was

"a certain leasehold in and to a certain large tract of land and premises * * * in which lease there was an unexpired term of four years; * * * various contracts with certain persons, firms and corporations for the construction and erection of various devices which would be useful and necessary in the operation and conduct of the business of this company."

In an issue of corporate stock for property purchased, and property taken over at a grossly excessive valuation, the stockholders are, nevertheless, entitled to have credited to the payment of stock the just and fair value of the property conveyed to, and services rendered for, the company, and for which stock was issued. See *See* v. *Heppenheimer, supra* (at *p. 76*) ; *Easton National Bank* v. *American Brick Co., 70 N. J. Eq. (3 Robb.)* *722* (at *p. 730*).

In *Pell's Case, L. R. 8 Eq. 222,* the master of the rolls decided that Pell was liable to be put on the list of contributories for shares of the capital stock of a company which was wound up, and which shares had been issued to him as fully paid for his interest in the good will and stock in trade of a business which he handed over to the company, but for which shares he paid no money; and it was held that he was liable as a contributory, but was entitled to be allowed the value of any property handed over by him to the company, and to an inquiry as to what was the value of that property. See the comment of Mr. Justice Depue on this case, and its subsequent history, in *Wetherbee* v. *Baker, 35 N. J. Eq. (8 Stew.) 501* (at *p. 513*).

It therefore becomes not only pertinent, but necessary, to inquire into the value of any property turned over by the promoters

to the corporation, because the stockholders are entitled to credit for any property that was received by the company, just as surely as they must be charged for lack of value where property or value is absent.

First, as to the lease. At the time the company was in a formative state the amusement park was under written lease to Peter E. Hurley, who held by assignment from Peter Wurfflein, the original lessee. It had four years to run, and Mr. Hurley agreed to cancel it for $4,000, to the end that a lease might be granted to the promoters. As the result of negotiations, Mr. Hurley was paid $4,000 by the promoters, and the owner of the land agreed to give to the promoters, or a company to be organized by them, a lease of the premises for ten years, including the four years of extension to which Hurley was entitled. At the request of the promoters the lease was made directly to the White City Company by the Trenton Street Railway Company and its trustee, for the consideration of one dollar, and the lessor therein and thereby granted, demised and let unto the lessee

"All that large lot of land and premises in the township of Hamilton, county of Mercer and State of New Jersey, commonly called Broad Street Park, consisting of about one hundred and twenty (120) acres of land, together with a lake thereon, covering about twenty-two (22) acres of land, commonly called Spring Lake, and also eighty-two (82) lots of land on the northerly side of said tract of land aforesaid, said lots being bounded by Randall avenue, McClellan avenue, Buchanan avenue and Sewall avenue, as shown on a map of the Broad Street Land Association, made in 1892, all of which demised premises are more fully and accurately described in a deed bearing date February 16th, 1895, and made by Lewis Perrine, Jr., and Addie Slack Perrine, his wife, to John L. Kuser and Robert S. Woodruff, trustees of the Trenton Passenger Railway Company, Consolidated, and recorded in the clerk's office of the county of Mercer in book 201 of Deeds, pages 94. &c., on April 15th, 1895, and also described in a certain other confirmatory deed dated April 27th, 1907, made by the said Lewis Perrine, Jr., and Addie Slack Perrine, his wife, to the Real Estate Title Insurance and Trust Company of Philadelphia, trustee for the Trenton Street Railway Company, and about to be recorded, with the appurtenances, for the term of ten years, from the first day of April. nineteen hundred and seven, to the first day of April, nineteen hundred and seventeen. And the said lessor in consideration of the premises does hereby covenant and agree, as follows: (*a*) That lessee shall and may peaceably have, hold and enjoy the said demised premises for the term aforesaid. (*b*) That they will furnish power for seventy arc lights of three watts each or their equivalent, and keep said lights lighted

during the periods when said park is open during the term of this lease. (c) That they will sell said demised premises and lessee hereby has the option to purchase the same at any time during the term of this lease for the sum of thirty-five thousand dollars ($35,000). (d) That at the end of the term aforesaid said lessee may remove from said demised premises all buildings erected thereon exclusively by lessee during the term of this lease, or acquired by it by purchase or otherwise, excepting as specified in covenants of lessee herein."

Counsel for the receiver argues that the promoters at the time the company was formed had no agreement in writing with the owners of the premises above mentioned which would bind them to make a lease, and that, therefore, there was no tangible property which would afford a basis for valuation and which could be considered property.

The defendant company was organized on March 26th, 1907. The organization meeting was held on that day; the resolution was passed reciting that the promoters owned and controlled the leasehold, which was thereby formally taken over by the company, and this too by the action of the promoters who would have taken the lease to themselves and made formal transfer of it, which was unnecessary, and which would have been a mere work of supererogation. That this lease was a thing of value cannot be gainsaid. Because the railway company was willing to make the lease for one dollar and agreed to furnish seventy arc lights and keep them lighted during the periods when the park would be open throughout the term of the lease, which was shown to be about three months of each year, for the reason that the expected business to be done at the park would be beneficial to it, the railway company, in trolley fares, without charging an annual rental, which anybody but the railway company owning the property undoubtedly would have done, cannot take away from the lease its element of rental value to the company. In other words, if an individual had owned the park it is to be assumed that he would have leased it only for a fair yearly rental, and if the promoters could induce him as an act of friendship or for some motive for his benefit, to forego that rental to them, they certainly could assign the lease to the company and themselves receive that rental; that is to say, if they could obtain the lease of the park for a nominal rental they

could assign it for an actual rental; that is to say, further, as they had possession and control of the property they could rent it.

The Wurfflein lease assigned to Hurley was dated May 1st, 1906, and ran for one year with the privilege of a renewal for four additional years, upon the same terms and conditions, namely, the sum of one dollar, with a covenant on the part of the lessor to place and maintain twenty electric arc lights and furnish and maintain incandescent lamps then on the premises. The lease to the White City Company was made on the expiration of the Wurfflein-Hurley lease, and, as already shown, was for one dollar, with a covenant that the lessors would furnish power for seventy arc lights of three watts each, or their equivalent, and keep them lighted during the periods when the park would be open during the term of ten years.

Prior to Hurley taking an assignment of the lease Wurfflein had run the park, but became involved in debt, and Hurley, who had backed him, assumed the debts and took over the lease, which he sold to the promoters for $4,000. The exact amount of Wurfflein's indebtedness to Hurley does not appear, nor is it important; the promoters had nothing to do with that; they dealt at arm's length with Hurley and gave him for the lease what was agreed upon by all parties.

In speaking of the value of this lease counsel for the stockholders urged that the property was worth $65,400 above the option price of $35,000, while the receiver's counsel contended that it was only worth $21,000, which was $14,000 less than the option price. They addressed themselves to the fee-simple title. Each side called one witness as to the value of the land comprising the park proper. The witness called by the stockholders was an old resident in the neighborhood who had bought and sold property there. The witness called by the receiver was a man who came to Trenton about the time the defendant company was formed and bought and developed another tract for building lot purposes. It would seem that the stockholders' witness valued the property too high, and the receiver's witness too low. But the value of the land is not to be determined in this proceeding because it is irrelevant to the issue. The value of the leasehold interest in it is quite another thing, and will be treated of presently.

It is too plain for argument that the option to purchase certain property at a certain price does not invest the optionee with newly-made wealth in the sum of the difference between what he would have to give for the property, if he gave it, and the value of the property which he would get, if he got it, assuming there was such difference, great or small. If property could be acquired or money made in that way there would be little other business done by anybody.

The value of this lease will have to be determined upon rental value, plus the other things of value to be received by the lessee, if any, under the terms of the lease.

Now, it must be remembered that this lease is in existence; it passed to the receiver and from him to the purchaser at his sale, and that its present owner is in possession of the property with the right to retain it and have the lights supplied for the full period granted, without the payment of a cent. That the company failed no more destroys the value of the lease than failure destroys the lease itself.

The promoters and the company had every reason to believe that the latter was launched upon a successful and profitable career, and, while the hope and expectation of success and profits could not create property out of that which was not property, equally the failure of those hopes and expectations cannot operate to destroy that which was and is property. The property exists to-day, and although its value may be depressed by the failure, its value is not to be ascertained as of the date of failure, but as of the date when the enterprise was inaugurated and the terms made.

If the directors had inventoried this lease and appraised it according to its rental value, but in doing so had given it a value in excess of that which it actually had, their judgment, in that regard, would not be reviewed by this court unless the overvaluation was so great as to shock the conscience. But as the directors did not do that, and as it now devolves upon the court to perform the duty which they neglected, the court will have to exercise its judgment now as of the time when they should have acted, in substitution for the judgment that they should have formed; and under this view the credit to be given to the stockholders by reason of the transfer of the lease to the company must be limited to the

then fair value of the lease. *Easton National Bank* v. *American Brick Co., supra* (at *p. 730*).

Speaking to this question, Mr. Justice Pitney (now chancellor) in that case said:

"Whether for this purpose we should accept the value of these [patents] as subsequently demonstrated [which is practically *nil*], or rather such value as might reasonably have been assigned to them at the time, need not be determined, for the reason that will presently appear." *Ibid.*

The question here mooted arises squarely in the case before me, and I unhesitatingly decide that the value of the property transferred should be determined as of the date and time when it should have been valued originally.

In *Rubino* v. *Pressed Steel Car Co., 53 Atl. Rep. 1050*, which was a suit for an injunction by certain stockholders of a corporation, a certain question arose and Vice-Chancellor Stevenson remarked (at *p. 1053*):

"If this enterprise is successful, the question will never be raised. I cannot see that the possibility of the failure of the enterprise justified the stockholder in going into court and asking for a preliminary injunction."

Clearly, neither subsequent success nor failure should be permitted to operate in the forming of a *nunc pro tunc* judgment.

The stockholders of the defendant company have an absolute right to the protection of whatever there was, fairly, reasonably and honestly of value in the property at the time it was acquired, and the extremely low price brought by the company's property at the receiver's sale is no criterion whatever of its value.

In *Martinett* v. *Maczkewicz, 59 N. J. Law (30 Vr.) 11*, the question of the value of certain chattels arose and evidence was offered of the price brought by them at a previous sheriff's sale, and the offer was overruled upon the ground that such a sale had no tendency to show the real value of the property. Said Chief-Justice Beasley (at *p. 14*):

"In our own state we have no pertinent decision. It is deemed, however, that the practice of our courts has been to exclude testimony of the kind in question. In inquiries of this nature it has been customary to show the market value of the property if it has

a fixed rate of that kind, and, if it has no such estimation, to prove its value by the opinion of experts and by an exposition of the state and condition of the things sold. In such an inquisition the price obtained at a sheriff's sale would seem to be wholly valueless. When a willing seller and a willing buyer agree and fix the price of an article, it is obvious that it is reasonable to infer that such estimation approximates closely to the real value of such article; but in an official sale by auction the owner has no voice in the affair, and each bidder is striving to obtain the thing sold not at its actual worth, but at a bargain. It is vain to deny, for all experience attests the fact, that, as a general thing, the attendants at a public auction of personal property are there with the expectation of acquiring the articles purchased much below their cost in the market. It is deemed that, as *criteria* of real value, such transactions can have no effect except to mislead."

The true method of calculating the value of an unexpired lease is not by ascertaining the yearly rental value and then multiplying the figures by the number of years the lease has to run, but by calculating its value by the annuity tables—that is, by multiplying the annual value by the value of one dollar per year for the number of years in the unexpired term. This was expressly decided in *West Jersey Railroad Co.* v. *Thomas, 23 N. J. Eq. (8 C. E. Gr.) 431, 434.*

Now, as to the arc lights which were to be furnished by the lessor under the terms of the lease, namely, seventy during the three months of each year when the park would be in operation.

It was stated that there was an agreement for ten lights for police protection for the entire year during the term of the lease, but no agreement for these extra ten lights was produced. The only agreement concerning the lessor furnishing lights is to be found in the lease. The stockholders are entitled to an allowance of whatever was the worth of having the seventy arc lights lighted for the full term of ten years.

The next item for which the stockholders claimed a credit was the saving made on the contract with Doak & Company for the construction of buildings at the park. Prior to the incorporation of the defendant company several of the promoters negotiated with Doak & Company for the erection of certain buildings, and

which Doak & Company agreed to construct for a commission of ten per cent. of the cost of the buildings and take their commission in preferred stock of the defendant company to be issued. The exact cost of the work supervised by Doak & Company does not appear, but it was between twenty-five thousand dollars and twenty-seven thousand dollars, and counsel for the stockholders claimed that there should be an allowance of $2,600 on that account; and this, apparently, upon the theory that the defendant company was thereby saved $2,600. True, the White City Company did not pay Doak & Company their percentage in cash, but, nevertheless, they paid it or obligated themselves to pay it in preferred stock of a company which the corporators believed would be a success and not a failure. They, therefore, settled with Doak & Company for their commissions in the way and manner in which Doak & Company agreed to receive payment. That they made an advantageous bargain with Doak & Company may be true, but that they saved the White City Company $2,600 cannot for a moment be admitted. Let me illustrate. If a corporation entered into an agreement with a contractor to erect a building and he agreed to take pay in preferred stock of the company, for the building which he was to construct, supplying the material and labor, could the company thereupon resolve that it had saved itself the entire amount of the contract price because it had paid the contractor with preferred stock instead of cash, and therefore issue, as for property purchased, an equal amount of common stock? The question answers itself. There can be no pretence that by any such transaction property could be created for which capital stock might be issued.

Another item of property for which the stockholders claim a credit is an arrangement or agreement with a man named Dentzel to build a carousel at the White City. Dentzel's regular or list price for the machine was $10,000, and through the efforts of Mr. Oberheide, principally, he agreed to sell one to a corporation to be formed for $8,000, which the promoters claim made a saving of $2,000, and which it is also claimed was property which was conveyed to the White City Company. This cannot be so. Oberheide told one or more of the directors that the printed list or selling price of carousels was way in excess of what they were worth.

It is notorious that staple articles of personal property are sold at a discount off the list price. The promoters, perhaps, made a good bargain for the White City Company with Dentzel, but by what they did they certainly did not create property worth $2,-000 which they turned over to the company, and the $2,000 in that behalf claimed cannot be admitted as a credit in this cause. Suppose the promoters had done nothing looking toward the acquisition of a carousel by the company, which, after its organization and by its officers, had purchased one from Dentzel through the same negotiation and on the same terms as the promoters had obtained the offer of one, could the company, having paid $8,000 for the carousel, by any system of bookkeeping give itself a credit of $2,000 in the transaction, and could it issue $2,000 worth of stock for property purchased? Where would be the property— the $2,000? It would not be in the company's treasury, nor would it be in Dentzel's pocket. In fact, it would have no existence. It never would have been created.

However, the promoters in negotiating for the purchase of this carousel at a discount of $2,000, performed some service for the company to be organized, and for that service they were entitled to reasonable compensation. *See* v. *Heppenheimer, supra* (at *p. 76*).

While formerly subscriptions to capital stock could only be paid in money, the doctrine has been relaxed and stock is now issued for work and labor as well as for the purchase of property, but the cases in which such transactions have been upheld were only those where the services rendered or property purchased were equal in value to the stock issued therefor. See *Wetherbee* v. *Baker, 85 N. J. Eq. (8 Stew.) 501, 512.* See, also, *Rubino* v. *Pressed Steel Car Co., 53 Atl. Rep. 1050.*

It seems to me that the promoters in this transaction are entitled to compensation for services in negotiating the advantageous purchase of the carousel.

Compensation for promoters' services is sometimes called "promoters' profits." *Bigelow* v. *Old Dominion Copper Co.; 74 N. J. Eq. (4 Buch.) 457, 501.* And said Chancellor Pitney in that case (at *p. 503*):

"Where a promoter's profit is taken in the form of shares that

represent no investment in money or in property, and exceed the reasonable services and legitimate expenses of the promoter, the shares are not deemed fully paid within the meaning of a statute that requires money or money's worth equivalent to the par value of the shares to be contributed by subscribers."

A credit of $10,000, as for property purchased, is asked by the stockholders because of an arrangement or agreement whereby the Public Service Corporation ran a feed wire from its plant in Trenton to the park for the purpose of supplying light. This has reference to the incandescent lights and is not connected with the arc lights which was to be provided by the street railway company. The line of feed wire was run through the streets of Trenton to the gate of the White City Park, and cost the Public Service Corporation $10,000. This was a special feed wire and was laid at the instance and request of the promoters and without it the White City Company could not have lighted its park with incandescent electric lights, for prior to its installation there was no feed wire to the park. This concession from the Public Service Corporation was not had for the mere asking, but was the result of considerable work and labor on the part of the promoters. It was a thing of value to the White City Company, but that it constituted $10,000 worth of property conveyed to that company cannot seriously be considered. Title to the feed wire did not pass to the White City Company, but still remains in the Public Service Corporation who owns the wire. It was not the promoters' $10,-000 that paid for this wire and the cost of laying it. It continues to be an asset of the Public Service Corporation, and will be useful to them in supplying light to the White City Company's successor, or successors, if they operate the park. Unlike the covenant in the lease to light the arc lights for nothing, the Public Service Corporation charged the White City Company for electricity for lighting and will be entitled to so charge its successors. The only thing that the promoters can lawfully claim with reference to this transaction is fair compensation for their services.

Counsel for the receiver urges that the arrangements with the Public Service Corporation were made by the White City Company after it was formed and refers to a minute of the board of directors of April 18th, 1907, wherein it was resolved that Messrs.

Oberheide and Sadler wait upon Mr. Lupke, superintendent of the Public Service Corporation, and arrange with him for the laying of a cable to the White City and secure the best rate possible from him. But the proofs show that the laying of the cable was negotiated by the promoters and the installation of the wire was actually begun in the previous month of March. This resolution undoubtedly refers to the making of terms for the furnishing of light to the company after it should have been opened to the public for the amusement season of 1907, commencing May 30th, Memorial Day. It was like the resolution of April 29th, appointing Messrs. Broughton, Hamill and Sadler a committee to notify Mr. Riggs (president of the street railway company) concerning the ten years' lease of the property to the defendant company. That company was already in possession of the property under the Wurfflein lease assigned to Hurley, and by Hurley to the promoters who owned and controlled it, and who permitted the White City Company to take the renewal, or rather the new lease, directly from the street railway company and its trustee, to itself (the White City Company), instead of themselves (the promoters), taking the new lease and assigning it to the company.

An amount of $1,400 is claimed as a credit because the White City Company had the use of roller skates owned by Messrs. Dickinson and Hamill, which they had previously used in a roller skating rink which they ran in Trenton. There was a roller skating rink built at the White City, and Messrs. Dickinson and Hamill agreed to allow the company to use the skates for five per cent. of the net receipts of the business done at the rink. I fail to see how there is even the pretence of property passing to the White City Company in this transaction. The company did not buy the skates. They remained the property of Messrs. Dickinson and Hamill, who were in reality the lessors. The skates were simply rented by the White City Company, and whether or not the rent was paid makes no difference as to the title of the property. If the skates were worth $1,400, that was so much of assets owned by Messrs. Dickinson and Hamill, and they never parted with their property. The skates did not pass to the White City Company and did not come to the hands of the receiver, were not inventoried as any part of the company's assets, and, conse-

quently, were not sold by the receiver, and did not pass to the purchaser of the park and its property. The claim that a lessee is enriched by the amount of the value of the leased property while in his possession, and even after the expiration of the term, as here contended for, needs no answer.

Another item of alleged property passing to the White City Company by and through the endeavors of the promoters is a saving of $3,000 on the price of a figure eight amusement device, which was constructed for the White City Company by the Bruenig Construction Company. In this matter the promoters dealt with the latter concern and got them to reduce their original estimate of the cost of the device some $3,000. This stands exactly in the same situation as the carousel, and the remarks concerning that device apply to this one. There was not a dollar of property in this transaction which passed to the White City Company. In this case, as in the other, the promoters are entitled to reasonable compensation for their services, and no more.

Counsel for the stockholders, in their brief of argument, claim that the things of value which were acquired by the White City Company were the real estate under the lease and the lighting agreement contained therein; the contract with the Public Service Corporation for the feed wire; with Doak & Company for supervising the construction of the buildings; the agreement with Dentzel for the carousel; the arrangement with reference to skates and the contract with the Bruenig Construction Company. The total valuation placed by counsel upon these properties is $113,900.

There were other things, said to be "property rights * * * and contract rights," which were claimed to be of value and to have been taken over by the company from the promoters in this case. They were of the same description, generally, as the amusement devices already referred to, and were not seriously contended for upon the argument.

Pursuing the subject they contend that the only dispute as to value is of and concerning the real estate. That is true in one sense, and in one sense only. Counsel for the receiver asserts that the lease was the only tangible property conveyed and claims that the other items were not property possessed by the promoters, and

that they could not be, and, consequently, were not, turned over to the White City Company. In this it is apparent that he is absolutely correct; and so it would have been idle to dispute the alleged value of things as property which had no value because they had no such existence. He claims further that the lease was turned over at cost price. In this I disagree with him as above outlined.

Title is the means whereby a man hath the just possession of his property. *2 Bl. Com. 195.* Deeds and other instruments of conveyance are the muniments or evidence of title. The White City Company got the possession of the park and got a lease for it. They never got possession of those various sums of $2,000, $3,000, $1,400, &c., nor did they receive any conveyance for the same, for the very good reason that they were not property, and, consequently, were utterly incapable of being conveyed. The lease was an asset; most of the other so-called properties were liabilities—that is, they were things for which the White City Company had to pay, as in the case of the carousel. For other things it did not have to pay a cent, as in the case of the Public Service Corporation's feed wire. Yet all are claimed to be assets. Impossible.

Some of the things taken over were assets, some liabilities, and others—nothing. As was said by Chancellor Pitney, in *Bigelow v. Old Dominion Copper Co., supra,* speaking of an inflated stock issue (at *p. 514*) : "Of the entire authorized capital * * * $1,000,000 is 'water' * * * and $1,250,000 represents nothing more substantial than 'wind.'" And so, if one were to pursue the phantom properties above adverted to, with the idea of possessing them, he would find that they were as evanescent as water and as inconstant as the wind.

Let us again resort to Vice-Chancellor Pitney's opinion in *See v. Heppenheimer, supra,* and paraphrase what he says (at *p. 55*), as follows: After all the true test is this: If the White City Company had to its credit in the bank the sum of $75,000, would it have been willing to pay that price in cash for the property in question; would it be worth that sum in cash to the company? If confronted with that proposition the gentlemen who composed the board of directors of the White City Company, all of them

business men, would have taken each item into deliberate and careful consideration. They would have been asked to say how much a ten years' lease of the property was worth, and they would have said that it was worth to them whatever was a fair rental value because it was turned over to them rent free, and they could have sublet or assigned the lease and thus made a rental to themselves.

Suppose Mr. Oberheide had said to them, "I want you to give me $2,000 because I induced Dentzel, a carousel maker, to sell you a carousel for $8,000, for which his asking price was $10,000, and which, by the way, is far in excess of what the machine is worth." I venture to say that not one of the directors would have made a motion that Oberheide be paid $2,000, let alone vote for such motion if made. What they doubtless would have been willing to do was this: If Oberheide had conceived the idea of exploiting an amusement park and secured the very lease in question and had secured the tentative propositions for the installation of amusement devices and other things that were actually secured and conceded to the White City Company in this case, and had taken the proposition to the gentlemen who were the directors of the White City Company, they would doubtless, if they concluded to take it over, have given him such a sum in cash or the stock of the company as his services in the promotion of the scheme were reasonably worth. And that measure of compensation is what the promoters of this company are entitled to under the law, and that will be given to them by the decree of this court.

If, as in most of the cases, the promoters of the White City Company had not been themselves a majority of its directors it would have been necessary for them to have selected competent persons for the directorate—men who would act wholly in the interest of future stockholders, and who would not be biased or influenced by the persuasions of the proposed vendors or by friendship for either of them—and to have made to those directors a disclosure of all material facts. In this case, however, the promoters were themselves directors, and constituted a majority of the board; and this being so, it was their duty to have acted as an independent board of directors, with full knowledge, would have

acted, namely, to have made a careful inventory and appraisement of all property to be purchased with stock or for cash, and to have either issued stock or paid cash, measure for measure—value for value. This they neglected to do, with the result that those whom they sought to protect are not protected, themselves included.

Several of the stockholders who are liable to an assessment are also creditors of the company, and their claims have been allowed by the receiver, but they are not entitled as creditors to set-off those claims against their liability as stockholders. Set-off is never permitted to stockholders. *Williams* v. *Traphagen, 38 N. J. Eq. (11 Stew.) 57; Hebberd* v. *Southwestern Land and Cattle Co., supra; See* v. *Heppenheimer, supra; Stone* v. *New Jersey and Hudson River Railway Co., 75 N. J. Law (46 Vr.) 172, 174.* They will be obliged to pay the amount of their assessments when ascertained, and will be entitled to share in the dividend when declared.

"It has always been the practice of this court," said Vice-Chancellor Pitney in *See* v. *Heppenheimer, supra* (at *p. 80*)—*"first,* to ascertain the whole amount of the unpaid debts; *second,* in case the unpaid stock subscriptions or stock issued without payment, to determine the names of such stockholders and the amount due from each, and *third,* to make an assessment against those stockholders, which, in case an action at law is brought, based upon that assessment, is conclusive against the stockholders."

And (at *p. 88*):

"In order to ascertain the whole amount of money necessary to be raised the receiver will compute the amount due on the several claims allowed by him and approved by this court by adding interest on each claim. To the sum of those will be added, first, the cost of the solicitors for the creditors, both in the proceeding to wind up the corporation and in this court, and to that will be added a reasonable counsel fee to complainant, to be fixed by the court on motion for that purpose; next, a round sum to cover the receiver's compensation and any further expenses which he may incur in the enforcement of this decree against the defendants held liable thereby.

"This last sum, of course, will be liable to a reduction, according to the conduct of the defendants in resisting its enforcement."

Furthermore, on the strength of *See* v. *Heppenheimer, supra* (at *p. 83*) the burden must be borne by the stockholders who are solvent and within the jurisdiction, and I may add, who are *sui juris.* Those against whom the decree goes have the right, however, to be protected against the others by way of contribution. *See* v. *Heppenheimer, supra* (at *p. 84*).

While the amount of the stock here issued is nearly double that of the debts, nevertheless it is asserted by the receiver that owing to the non-residence, insolvency and infancy of some of the stockholders, an assessment of the full face value of the stock against the resident, solvent and adult stockholders is necessary. But while the stockholders in this case will be obliged to respond, their liability as to amount can be ascertained only after allowing them credit for the value of the lease of the park, the covenant for arc lights and the services of the promoters. There is no evidence before the court of the value of these things (save the arc lights, concerning which there is such evidence), the case having been tried on an entirely different theory.

However, this court has the power to continue a hearing and permit further and other proof to be taken, and that power ought to be exercised where it does not appear that injustice will be done, and where, on the contrary, justice seems to require it. *Whitehead* v. *Hamilton Rubber Co., 53 N. J. Eq. (8 Dick.) 454.*

This case, in my judgment, falls within this rule, and I will set a day on application of the stockholders on notice to the receiver for the taking of proofs on the questions just mentioned. *Mason* v. *Ross, 75 N. J. Eq. (5 Buch.) 186, 149.*

And now, finally, the settled law of this state enforces upon me the duty of pronouncing the only decree possible in this case, namely, one holding the stockholders liable to assessment to the extent above indicated, and in an amount to be ascertained upon further hearing.