In re McAUSLAND.

(District Court, D. New Jersey. August 8, 1916.)

1. EXECUTORS AND ADMINISTRATORS ☞272—DEBTS OF TESTATOR—CHARGING ON LAND.

By New Jersey laws, a direction by testator in his will that his debts be paid charges such debts on his realty.

[Ed. Note.—For other cases, see Executors and Administrators, Cent. Dig. §§ 1052–1057, 1059, 1065, 1068; Dec. Dig. ☞272.]

2. WILLS ☞841—LIABILITIES OF DEVISEES—DEBTS OF TESTATOR—ACTIONS AGAINST DEVISEES—LIMITATION.

By New Jersey laws, where a will charges a debt on land of testator, the creditor obtains an equitable estate or interest in such realty enforceable within 20 years from testator's death.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 2143, 2144; Dec. Dig. ☞841.]

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

3. BANKRUPTCY ☞188(1)—LIENS—DEBTS OF TESTATOR.

The laws of the state where the assets of a bankrupt are control as to the nature and effect of a lien thereon for debts of a testator.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 286–289, 291, 293, 294; Dec. Dig. ☞188(1).]

4. BANKRUPTCY ☞188(3)—TITLE OF TRUSTEE—EFFECT ON LIENS.

Equitable liens in favor of creditors of a decedent upon land devised by him are not lost by passing of the legal title of the land to trustee in bankruptcy of his devisee, for such property passes in the same plight and condition as that in which the bankrupt holds it, and subject to all equities impressed upon it in the hands of the bankrupt.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 270, 295; Dec. Dig. ☞188(3).]

5. WILLS ☞841—LIENS ON LAND DEVISED—WAIVER.

Nor were such liens waived by creditors of decedent, because the bankrupt widow and devisee mingled proceeds of her husband's life insurance policy with the proceeds of her husband's business, continued by her, and the income from his real estate, and applied them indiscriminately to paying taxes, interest, repairs, etc., drawing checks as executrix, and largely reduced his debts;˙ it not appearing that she was carrying on the business as agent for decedent's creditors, or that they knew she was becoming insolvent.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 2143, 2144; Dec. Dig. ☞841.]

6. EXECUTORS AND ADMINISTRATORS ☞263—CLAIMS—WAIVER OF PRIORITY.

Creditors of a decedent whose business has been carried on in the absence of testamentary direction, by his widow, who is executrix and sole beneficiary under the will, will not be deprived of having their claims first paid out of assets of deceased, unless the business has been carried on for such period as reasonably necessary to wind it up and sell it as a going concern for the benefit of all, or unless carried on at the request of decedent's creditors and on their behalf.

[Ed. Note.—For other cases, see Executors and Administrators, Cent. Dig. §§ 975–1000; Dec. Dig. ☞263.]

7. EXECUTORS AND ADMINISTRATORS ☞264(1)—LIENS—WAIVER OF PRIORITY.

Mere knowledge by creditors of a decedent, who have a lien upon his real estate for their debts, that the estate is carrying on testator's business does not prejudice their status as creditors with respect to priority of their claims.

[Ed. Note.—For other cases, see Executors and Administrators, Cent. Dig. §§ 997, 1001, 1002–1009, 1011; Dec. Dig. ☞264(1).]

8. BANKRUPTCY ☞188(1)—LIENS—AS AGAINST TRUSTEE—WAIVER.

The failure of decedent's creditors to force his widow, who was his sole devisee and executrix, and who became bankrupt after his death, to settle her husband's estate is not in itself sufficient to prevent the enforcement of their liens charged on his lands.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 286–289, 291, 293, 294; Dec. Dig. ☞188(1).]

9. WILLS ☞841—LIABILITIES OF DEVISEES—DEBTS OF TESTATOR—LIEN AGAINST DEVISEES.

The lien by New Jersey law upon lands of a decedent for his debts by testamentary direction or by statute arises at his death, and exists irrespective of the legal or equitable proceedings that may have to be instituted to enforce it.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 2143, 2144; Dec. Dig. ☞841.]

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**10. BANKRUPTCY ⬦�ネ200(1)—LIENS—FOUR-MONTHS PERIOD.**

The four-months period referred to in Bankruptcy Act July 1, 1898, c. 541, 30 Stat. 544, has reference to such liens only as are placed on the bankrupt's property during that time by legal process or act of the parties, and not to those attached to the property when it came into the bankrupt's hands.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 289; Dec. Dig. ⬦⟻200(1).]

**11. BANKRUPTCY ⬦⟻214—LIENS—CREDITORS OF DECEDENT—PRIORITIES OBTAINED BY SUIT BEFORE BANKRUPTCY.**

Institution of suits before bankruptcy by certain creditors of a decedent against a bankrupt devisee to enforce their lien on devised lands, whether founded on the Heirs and Devisees Act (2 Comp. St. N. J. 1910, p. 2739), giving such right of action against devisee, or invoking the general equity powers to enforce an equitable lien, cannot avail to obtain priority over other creditors belonging to the same class, since, even if judgment were rendered before commencement of bankruptcy proceedings, none would obtain priority over the others by first obtaining judgment; hence such suits are properly enjoined.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 320, 324–327, 343, 344; Dec. Dig. ⬦⟻214.]

**12. BANKRUPTCY ⬦⟻211—LITIGATION IN BANKRUPTCY COURT—CLAIMS TO BANKRUPT'S PROPERTY.**

Since the legal title to lands and assets of a bankrupt passes to the trustee, when appointed, the bankruptcy court, and not the state court, is the judicial forum in which to litigate contentions as to such lands and assets.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 321, 323; Dec. Dig. ⬦⟻211; Courts, Cent. Dig. § 1331.]

**13. PAYMENT ⬦⟻16(1)—DISCHARGE—INTENTION.**

As between the parties to an indebtedness, the acceptance of a note or any number of renewals for such indebtedness does not discharge it, in the absence of a clear intention to do so.

[Ed. Note.—For other cases, see Payment, Cent. Dig. § 63; Dec. Dig. ⬦⟻16(1).]

**14. NOVATION ⬦⟻12—BURDEN OF PROOF.**

The burden of proof to show novation is usually on the debtor alleging it.

[Ed. Note.—For other cases, see Novation, Cent. Dig. § 12; Dec. Dig. ⬦⟻12.]

**15. NOVATION ⬦⟻12—BURDEN OF PROOF.**

Showing that creditor surrendered notes and took notes for the same amount from another shifts to the creditor the burden of showing no novation, since notes signed and indorsed are prima facie evidence of a contract only with their maker.

[Ed. Note.—For other cases, see Novation, Cent. Dig. § 12; Dec. Dig. ⬦⟻12.]

**16. NOVATION ⬦⟻5—LIEN—ABANDONMENT.**

Where a trust company replaced notes of bankrupt's devisor with notes of bankrupt, and surrendered old notes, marking them "paid," such replacements occurring several times between death of devisor and the bankruptcy, no claim being presented against devisor's estate for the debt, it accepted the bankrupt as debtor in place of devisor, and abandoned its lien as creditor upon lands devised to the bankrupt.

[Ed. Note.—For other cases, see Novation, Cent. Dig. § 5; Dec. Dig. ⬦⟻5.]

**17. BANKRUPTCY ⬳345—CLAIM OF MORTGAGEE FOR DEFICIENCY—BARRED BY ORDER.**

The mortgagee of the testator of bankrupt devisee is not estopped to assert priority as against creditors of bankrupt of claim of lien upon lands devised to bankrupt for deficiency upon foreclosure because of his failure to respond to referee's order to show cause why property of bankrupt should not be sold free of all incumbrances, such order being prior to foreclosure sale, since at that time mortgagee's only interest in lands affected by the order was the possible one of testator's debt not being satisfied through the foreclosure sale.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 531, 532, 534, 539, 540; Dec. Dig. ⬳345.]

**18. EXECUTORS AND ADMINISTRATORS ⬳231—NONPRESENTATION OF CLAIMS—LOSS OF LIEN.**

Under New Jersey law (Heirs and Devisees Act [2 Comp. St. N. J. 1910, p. 2739]), the failure of a creditor of a decedent to present his claim to decedent's executrix, who is decedent's sole devisee, before entry of decree to bar creditors, does not prevent him from following the real estate in her hands to enforce creditor's lien thereon.

[Ed. Note.—For other cases, see Executors and Administrators, Cent. Dig. §§ 804, 828, 829; Dec. Dig. ⬳231.]

**19. BANKRUPTCY ⬳188(3)—LIENS—WAIVER BY FAILURE TO PRESENT CLAIM.**

The failure of creditor of a decedent to present his claim to the executrix, who is decedent's sole devisee, before she is adjudged a bankrupt does not prevent him from following the real estate passing to the trustee in bankruptcy, nor does it affect his creditor's lien.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 270, 295; Dec. Dig. ⬳188(3).]

**20. BANKRUPTCY ⬳211—CLAIM FOR DEFICIENCY UPON FORECLOSURE.**

Upon the intervention of bankruptcy of the executrix of a decedent, a claim by mortgagee of decedent for deficiency upon foreclosure is to be presented in the bankruptcy court rather than by suit for such deficiency under 3 Comp. St. N. J. 1910, p. 3420, on the obligor's bond.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 321, 323; Dec. Dig. ⬳211.]

**21. BANKRUPTCY ⬳310—CLAIMS—SURRENDER OF SECURITY BY MORTGAGEE.**

Under Bankruptcy Act, § 57, subds. "a," "h" (Comp. St. 1913, § 9641), as to allowance of balance of secured claims, when the trustee does not elect to redeem by paying a secured debt, the secured creditor, having the right to sell the security, is not required to elect either to rely on his security or to surrender it and file claim for the whole amount of his debt, but may sell the security and file a claim for the unpaid remainder.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 501-507; Dec. Dig. ⬳310.]

**22. BANKRUPTCY ⬳323—CLAIM FOR BALANCE AFTER FORECLOSURE—VALUE OF SECURITY.**

Upon claim for balance of secured debt after sale of security, the bankruptcy court, in the absence of a legal rule in the state making the sum for which the property is bought in at a public sale conclusive of its value, is bound to consider the question of value on allegation of inadequate price realized at such a sale.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 503, 505, 513; Dec. Dig. ⬳323.]

**23. EVIDENCE ⬳113(14)—VALUE—PRICE AT JUDICIAL SALE.**

In New Jersey and bankruptcy courts therein, the price brought by property at a judicial sale is no criterion whatever of its value.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 280; Dec. Dig. ⬳113(14).]

**24. BANKRUPTCY ☞340—PROOF OF BALANCE OF SECURED CLAIM—PROOF OF VALUE—BURDEN OF PROOF.**

On proof of claim, showing that claimant, on sale of security for its debt, bought in the property, claimant has the burden of showing that said property was not of sufficient value to pay the debt.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 527; Dec. Dig. ☞340.]

**25. BANKRUPTCY ☞340—PROOF OF BALANCE OF SECURED CLAIM—PROOF OF VALUE—BURDEN OF PROOF.**

The failure of such claimant to meet trustee's evidence that the property was sold for inadequate price raised the presumption that it was worth the amount of the debt, and justified the referee's rejection of its claim, notwithstanding claimant's offer to turn over the purchased property to the trustee on being paid the full amount of his claim; the trustee not being in a position to redeem even if he had authority to do so.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 527; Dec. Dig. ☞340.]

**26. BANKRUPTCY ☞324—CLAIMS—INTEREST ON CLAIMS OF LIENORS.**

Interest on allowed claims of creditors of one devising all his lands to one becoming bankrupt should be allowed to date of sale of such lands, where the proceeds of such sale more than pay the principal of such debts, and if the proceeds are insufficient to pay the principal and the interest, the claimants should prorate therein.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 511; Dec. Dig. ☞324.]

**27. BANKRUPTCY ☞324—AMOUNT OF CLAIMS—INTEREST.**

The rule in bankruptcy that interest stops with the filing of the petition has no application to solvent estates.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 511; Dec. Dig. ☞324.]

In Bankruptcy. In the matter of the bankruptcy of Mary E. Mc-Ausland. On petitions to review referee's disposition of fund realized from sale of real estate. Decree ordered in conformity with opinion.

Merritt Lane, of Jersey City, N. J., for trustee.

McDermott & Enright, of Jersey City, N. J., for Lincoln Trust Co. of New Jersey.

Fisk & Fisk, of Jersey City, N. J., for Third Nat. Bank of Jersey City.

Treacy & Milton, of Jersey City, N. J., for Burke Bros. Co. & Burke Bros.

James A. Gordon, of Jersey City, N. J., for Jaburg Bros.

Collins & Corbin, of Jersey City, N. J., for New Jersey Title Guarantee & Trust Co.

RELLSTAB, District Judge. This is a controversy over the distribution of the proceeds of the trustee's sale of certain lands which were devised to Mary E. McAusland, the bankrupt, by John McAusland, her husband, who died on April 14, 1911. By his last will and testament, probated on April 25, 1911, after directing that all his just debts be paid and appointing his wife sole executrix, he gave to her absolutely all the remainder of his estate. The widow took out

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

letters testamentary, but, beyond taking a rule to bar creditors and a decree based thereon, took no steps in the administration of the estate; she filed no inventory, made no application for the sale of the testator's real estate to pay his debts, and rendered no account of her stewardship. Under the laws of New Jersey, the deceased's personal representative who is the sole residuary of the estate, is not required to file either an inventory of the personal property or an account of his stewardship. However, a creditor may force such an administration of the estate, if his claim has not been satisfied. 3 N. J. Comp. Stat. p. 3855, §§ 119, 120.

The testator died seised of both real and personal estate. For some years prior, and up to the time of his death, he had carried on a bakery and ice cream business, the first under the name of the City Bakery, and the latter as the Columbia Ice Cream Company. These businesses the widow continued until the commencement of the present bankruptcy proceedings. While carrying on said businesses, she paid a part of her husband's indebtedness, contracted additional debts, only a part of which she paid. Not all of the creditors of the deceased filed claims against his estate, and none took any legal proceedings in the orphans' courts (court of probate, etc.) before the intervention of bankruptcy, to compel the executrix to proceed with the administration of her husband's estate, but about the time the bankruptcy proceedings were begun some of such creditors took legal proceedings to enforce their claims against the assets of the decedent's estate.

The petition in bankruptcy was filed against the widow on the 27th of March, 1913. Between the time of her husband's death and the commencement of said bankruptcy proceedings, the widow sold three of the parcels of real estate of which her husband died seised. The suits begun in the courts of New Jersey against the bankrupt as the beneficiary of her husband's will were by Burke Bros. Company, the Third National Bank of Jersey City, Jaburg Bros., Ambrose L. O'Shea, trustee in bankruptcy of the New York White Cross Milk Company, under the New Jersey act entitled "An act for the relief of creditors against heirs and devisees" (2 N. J. Comp. St. p. 2739, commonly known as the "Heirs and Devisees Act"), and by the Lincoln Trust Company of New Jersey, and Jessena Kerr, to enforce the liens said to arise in favor of creditors, under the will of said testator.

All these suits were enjoined by this court, and the plaintiffs were relegated to the bankruptcy court to establish their claims. The New Jersey Title Guarantee & Trust Company, a creditor of the decedent, who held a mortgage covering one of the decedent's parcels of real estate, was permitted to foreclose and sell such mortgaged real estate. The trustee in bankruptcy, under order of the referee, after notice to the creditors, sold the remaining parcels of real estate free and clear of all the liens which the creditors of the decedent, other than mortgage creditors, claimed they held against such real estate These sales netted $15,877.74, and the referee's disposition of this fund is challenged by the present reviews. Broadly stated, the referee decided that the creditors of John McAusland were entitled to be

first paid out of this fund. Specifically he decreed (so far as pertinent to the present reviews) that the following claims had priority:

| | | |
|---|---|---|
| The Third National Bank of Jersey City | for | $3,300.00 |
| Jaburg Bros. | " | 3,700.00 |
| Burke Bros. & Burke Bros. Company | " | 2,242.72 |
| Jessena Kerr | " | 2,300.00 |
| Ambrose L. O'Shea, trustee of the New York White Cross Milk Company, | " | 888.10 |
| Chas. W. Cropper | " | 92.00 |
| J. C. Coal Company | " | 156.25 |
| Voss Ice Machine Works | " | 1,407.50 |

He disallowed the following claims: Lincoln Trust Company of New Jersey for $98.75, alleged debt of John McAusland, and for $3,700, alleged advances for payment of taxes, and the New Jersey Title Guarantee & Trust Company alleged deficiency for $7,618.30. He also denied interest on the allowed claims, subsequent to the death of John McAusland. The effect of this decision is to practically exclude the holders of the unpaid bills incurred by the bankrupt, while she conducted such business, from receiving anything out of the assets which came into the hands of the trustee. The correctness of this decision of the referee allowing priorities is challenged by the trustee. He and several of the creditors of the decedent also attack the referee's findings applicable to specific claims of such creditors, and the said creditors, who were allowed priorities, attack the said disallowance of interest.

[1-3] *First, as to priority of decedent's creditors:* By the laws of New Jersey, a direction by the testator in his will that his debts be paid serves to charge such debts on his realty. Shreve v. Shreve, 17 N. J. Eq. 487. By reason of such charge the creditor obtains an equitable estate or interest in such realty enforceable within 20 years from the testator's death. McKinley v. Coe, 66 N. J. Eq. 77, 57 Atl. 1030. The laws of the state where the assets are control as to the nature and effect of the lien. Thompson v. Fairbanks, 196 U. S. 516, 25 Sup. Ct. 306, 49 L. Ed. 577; Humphrey v. Tatman, 198 U. S. 91, 25 Sup. Ct. 567, 49 L. Ed. 956; Hiscock v. Varick Bank of New York, 206 U. S. 28, 27 Sup. Ct. 681, 51 L. Ed. 945. That the personal estate is the primary fund from which the debts of a decedent are to be paid is of no moment on the general question here considered.

[4, 5] These equitable liens in favor of the creditors of decedent were not lost by the passing of the legal title of the lands affected to the trustee, for such property passed in the same plight and condition as that in which the bankrupt herself held it, and subject to all the equities impressed upon it in the hands of the bankrupt. York Manufacturing Co. v. Cassell, 201 U. S. 344, 26 Sup. Ct. 481, 50 L. Ed. 782; Bryant v. Swofford Bros., 214 U. S. 279, 29 Sup. Ct. 614, 53 L. Ed. 997. The trustee does not deny that such an equitable lien or charge upon the realty of the decedent inured to his creditors, but contends that, in this case, by their conduct with relation to the bankrupt's continuing the business of the decedent, they waived their liens, or that they are estopped from claiming any priority over the debts

incurred by the bankrupt. 'The bankrupt mingled $5,000 insurance, payable to her on a policy on her husband's life, with the moneys derived from her husband's business continued by her and. the income from his real estate, and applied them indiscriminately to the payment of taxes, interest, repairs, business and other debts of hers and her husband's, including the family living expenses. She had several checking accounts with the local banks; one in the name of the City Bakery, another in the name of the Columbia Ice Cream Company, another in the name of the Estate of John McAusland, and a fourth in her own name.

The City Bakery business, during the period it was carried on by her, was apparently run at a loss, approximating $6,000, but during this period she reduced the debts of such business as they stood at the time of her husband's death approximately $5,800. The ice cream business was run at a profit, and by the time of the filing of the petition in bankruptcy, the indebtedness of decedent on account of this business had been reduced approximately $11,000. The profits, however, did not net this sum by about $3,500. This net reduction of decedent's indebtedness by approximately $9,300 came from some source outside of these businesses, and the contention of the trustee is that it came principally from the assets furnished by the bankrupt's creditors, and that it would be inequitable to permit the creditors of the decedent, who stood by while all this was being done by the bankrupt, to now appropriate to themelves the fund realized from the sale of the real estate to the exclusion of the other creditors, whose property in part enabled her to pay some of the said $9,300 to her husband's creditors. The record fails to sustain this contention, or that these creditors had knowledge that one of these businesses was being carried on at a loss, or that decedent's indebtedness was being reduced by moneys contributed by the bankrupt's creditors.

The fact that the checks were made by bankrupt as executrix did not bring home to the creditors of decedent that the payments were from an improper or even suspicious source. If they had been as pressing for the payment of their claims against the decedent as the trustee thinks they should have been, that method of payment would be the regular way to settle their accounts. Nor is that way of paying the indebtedness—old or new—influential on the question whether the bankrupt was carrying on such business as agent or trustee for the creditors of the decedent. The bankrupt was not carrying on the business left her by her husband as the representative of such estate. The will neither authorized nor contemplated the carrying on of such business in that way. It was not done by express request of the creditors, and there is nothing in the record to warrant finding an implied request so to do by the decedent's creditors any more than by the creditors of the bankrupt. In this respect they occupy like positions, and no equity arises in favor of the one as against the other by reason thereof.

Willis v. Sharp, 115 N. Y. 396, 22 N. E. 149, 5 L. R. A. 636, mainly relied upon by the trustee, is a case where the will directed the continuance of the business, and an attempt was made on motion to sub-

ject the assets of the estate to the payment of a debt incurred by the executor in continuing the business in preference to the debts of the testatrix. The other creditors had no notice of such motion, and were not before the court on the hearing thereof. In reversing the lower court, which had granted such priority, the Court of Appeals held that a creditor of the deceased could insist that the estate as it existed at decedent's death be used for the payment of decedent's debts to the exclusion of debts subsequently created by the executrix, unless such creditor, in some way, consents to the continuance of such business by the executrix. How such consent was to be evidenced was not stated, as that question was not before the court. Mere acquiescence is not consent.

In re Levi Estate, 224 Pa. 283, 73 Atl. 334, another case cited by the trustee, presents a contest between the beneficiaries under a will and the creditors who contributed to the capital for continuing decedent's business by the executor with the acquiescence of such beneficiaries. This acquiescence was held to subordinate the interests of the beneficiaries to the claims of such creditors. In that case, however, it was said that the creditors of the decedent, whose claims were based on contracts made with him in his lifetime, stood on a different footing, and that their rights to participate in the distribution and to be first paid the full amount of their claims could be waived only by express agreement based upon a valid consideration.

Re Millard, Ex parte Yates, 72 L. T., Aug. 17, 1895, Court of Appeals, announces the rule which, in my judgment, should control this question. Millard in his lifetime had carried on the business of a merchant. By his will he left all his property to his widow, and appointed her sole executrix. He gave no direction to carry on his business, but his widow continued it for about six months, with the written consent and acquiescence of Yates (appellant), a creditor of the testator, when the estate was put in bankruptcy. The court of first instance considered that the business had been carried on for the purpose of properly realizing on the estate with the assent or acquiescence of the creditors of the deceased, and subordinated their claims to those debts incurred in carrying on the business. The Court of Appeals reversed this decision, and held that the business had not been carried on in the interest of the decedent's creditors, but on behalf of the widow and in her own interests, and that the creditors of the testator should be first paid.

The facts of that case are much more favorable for the application of the rule contended for by the trustee than those of the instant case. In that case Yates entered into an agreement with the widow, which recited inter alia that, since the death of her husband, the widow had, with the consent of Yates, continued to carry on the business; that the financial part of the business would not permit of the immediate discharge of the moneys due to Yates by decedent; that to insist upon immediate payment would necessitate the winding up of the business; that Yates agreed to accept payment by installments; that he was to have the right to inspect the accounts of the business and to pass upon the fitness of an assistant manager to be employed to

look after the business; that collateral security was to be given to Yates for present or future trade accounts between him and the widow. The widow signed the agreement personally and as executrix and universal legatee. The agreement for the payment of Yates' debt by installments anticipated that more than six years would elapse before the whole would be paid, but the agreement between them was subject to termination at any time, upon default by the widow of any of such payments or the happening of any one of a number of events—becoming bankrupt, dissatisfaction of the balance sheet on the part of Yates, or inspection of the books, being some of them. On the facts, Rigby, L. J., concluded:

"So far as the appellant is concerned, the agreement amounts to a conditional postponement of his right to sue for the £1,600 in consideration of Mrs. Millard giving her own promissory note for that sum to be a security for the whole indebtedness, both of her husband and of herself. Mrs. Millard is not bound to carry on the business any longer than she thinks fit. She is not made trustee, and no trust is declared of the assets. The conclusion appears to me to be unavoidable that the testator's assets are to be divided amongst his creditors, including the appellant, and nothing will remain for Mrs. Millard's own creditors, whose misfortune it is that they have given credit to a person without any means to pay them. In my judgment the order appealed against them should be discharged, and directions given to the official receiver to divide the assets among the creditors of the deceased. I have already pointed out that the claims of the creditors of the deceased will more than exhaust the assets."

[6] This case, in my judgment, announces the correct principle, viz.: That the creditors of a decedent whose business has been continued by the widow, who is both the executrix and the sole beneficiary under the will, but without testamentary direction to do so, will not be deprived of having their claims first paid out of the assets of the deceased, unless the business has been carried on by the personal representatives for such a period as is reasonably necessary to wind it up, and sell it as a going concern for the benefit of all, or at the request of the old creditors, and on their behalf, that is, by the executrix or beneficiary as the agent or trustee of the old creditors.

[7] The fact that some of the decedent's creditors did business with the bankrupt and received payment on account thereof, as well as on their claims against testator, and that some of the payments were made by her as executrix, does not, in my judgment, change the status of these creditors with respect to the priority of their claims against decedent's property. They exercised no control over the widow, as to how she should conduct her business; for hers it was, subject only to the payment of decedent's debts. That she saw fit to carry her bank account in several banks in different names and to sign some of her checks as executrix was a matter for her decision. So far as the payments on the claims against decedent were concerned, those made as executrix were made in the appropriate way; and so far as the payments on account of the debts incurred in the carrying on of the business after the decedent's death were concerned, while they, of course, suggest and tend to establish that such business was carried on by the widow as executrix, they are not conclusive on that question; but if they were, that does not affect the status of decedent's

creditors as to the unpaid claims which they hold against his estate. Mere knowledge on the part of a creditor of the deceased that the estate is carrying on the business, or acquiescence on his part, does not prejudice his status as such creditor. In any new business with the widow, whether individually or as executrix, they occupy the same relation to her and her estate, as do all the other creditors who likewise dealt with her in that capacity. The unpaid debts incurred by her occupy a subordinate position to those contracted with her husband.

That the creditors of the bankrupt, other than those who were also creditors of the decedent, will get nothing, while the latter will share the proceeds derived from the sale of the decedent's real estate, though unfortunate, is not inequitable. What the creditors of the decedent will so receive is not derived from the estate of the bankrupt, but from that of the bankrupt's husband. These creditors will receive nothing from that source on their claim against the bankrupt. As to such claims they stand on the same footing and share the same misfortune as those creditors who have claims only against the bankrupt. They divide the assets of the testator, because they are creditors of such decedent, not because they are also creditors of the bankrupt.

[6] The bankrupt took the testator's lands subject to the payment of his debts, and every one who dealt with the bankrupt knew, or is chargeable with knowing, that such debts were a lien upon such lands, and they cannot complain that such assets are not more than sufficient to pay such liens. The failure of the decedent's creditors to force the bankrupt, as executrix, to settle her husband's estate is not in itself sufficient to prevent the enforcement of their liens against his lands.

In New Jersey, from a very early period, it has been held that staying the execution after levy, leaving the property in the hands of the judgment debtor to deal with as his own, does not render the execution constructively fraudulent. Caldwell v. Fifield, 24 N. J. Law, 150, 157. In this case C. J. Green said:

"The object of extending indulgence to the debtor is to allow him an opportunity by his own exertions and the prosecution of his business to pay the debt. But if the property of a man in business, whether as a merchant, a manufacturer, or a farmer, be levied upon, he must, of necessity, if permitted to pursue his business to any advantage, deal with the property as his own. Goods must be exchanged, the raw material converted into manufactured articles and sold or bartered, the crops of the farm must be gathered and disposed of, the stock must be fed, the laborers must be paid; every revolving season, if not every successive week, must witness changes in the property levied on destructive of the validity of the lien. If the debtor be permitted to hold and enjoy the property, why should he not be permitted to use it in the only way it can be effectually used to enable him to pay his debts? If the one is consistent with fair dealing, why is the other per se fraudulent?"

There is no charge of actual bad faith on the part of the decedent's creditors in relation to the widow's continuing her husband's business, and there is nothing in the mere fact that they allowed her to so continue for a little less than two years without protest, or that they dealt with her commercially during such period, that justifies the

conclusion that she acted as their agent or trustee. She was hopeful and they were helpful. True, they could have directly forced her to settle her husband's estate, but the creditors of the bankrupt could have done so indirectly. For her to continue her husband's business in the circumstances was neither unnatural nor reprehensible and to penalize the husband's creditors for not compelling her to pay her husband's debts before she contracted any of her own, for the benefit of her creditors, finds no warrant either in principle or precedent.

[9, 10] The further contention of the trustee that there is no lien upon the real estate for the payment of a decedent's debts until suit is brought, and that, inasmuch as the earliest of the suits brought to charge such debts upon the realty was brought within four months of the filing the petition in bankruptcy, there is no lien binding upon the creditors, is equally without merit. The lien upon the lands of a decedent for the payment of his debts arises in two ways: By act of the testator or by statute. In the absence of a positive direction of the testator the statutes alone govern, but where the testator himself directs the payment of debts, the statutes merely co-operate. The statutes operate regardless of whether the decedent died testate or intestate. In each case the lien exists irrespective of the legal or equitable proceedings that may have to be instituted to enforce them. Hence, it is unaffected by the four-months period referred to in the Bankruptcy Act, the antedating of which period is essential to protect a lien placed on the property of the bankrupt by legal proceedings or the act of the parties. That limitation has reference only to liens fastened upon the property within that period, and not to those attached to the property when it came into the hands of the bankrupt. See Metcalf Bros. & Co. v. Barker, 187 U. S. 165, 174, 23 Sup. Ct. 67, 47 L. Ed. 122, and Thompson v. Fairbanks, 196 U. S. 516, 525, 25 Sup. Ct. 306, 49 L. Ed. 577.

Turning now from the broad question as to priorities between the classes of creditors, i. e., those whose debts were incurred by the decedent and those incurred by the widow, either as executrix or sole beneficiary, the contentions affecting only the debts of the decedent will now be considered.

[11] The suits instituted by some of the creditors, whether founded on the Heirs and Devisees Act, supra, or invoking the general equity powers to enforce an equitable lien, cannot avail to obtain priority over the creditors belonging to the same class. Some of these were instituted before the bankruptcy proceedings were begun. Those founded on the Heirs and Devisees Act were to enforce that statute's provision, fastening the decedent's debts upon the lands devised to the bankrupt, and still held by her. The others were to enforce equitable liens upon such lands arising from the testator's directions.

[12] Both remedies were available to all the decedent's creditors, and none would have obtained priority over the others by first obtaining a judgment, even if such judgment had been rendered before the commencement of bankruptcy proceedings. The legal title to the lands as assets to be affected by such suits was in the bankrupt, subject to the payment of such debts. The filing of the petition in bank-

ruptcy in no way changed this situation; but as the legal title to such lands, etc., would pass to the trustee in bankruptcy, when appointed, the bankruptcy court, and not the state court, would be the judicial forum in which to litigate the respective contentions with respect to such lands and assets. Thomas v. Woods, 173 Fed. 585, 590, 97 C. C. A. 535, 26 L. R. A. (N. S.) 1180, 19 Ann. Cas. 1080. The institution of said creditors' suits in the state courts gave plaintiffs therein no additional rights whatever; and, as they had not proceeded to judgment, they were properly enjoined. That judgment would have eventually followed, if the suits had not been restrained, makes no difference. As between the creditors of the decedent the institution of suits effected no priority.

The trustee further contends that some of the decedent's creditors abandoned their claims against the decedent by substituting the widow as their debtor, and some of said creditors make a like contention as to the claims of the Lincoln Trust Company. The referee disallowed the latter's claim on this ground, from which decision it appeals. As to the trustee's contention, it is deemed sufficient to say that the facts do not warrant the application of the doctrine of novation to any creditor save the Lincoln Trust Company.

[13-16] The claim of the Lincoln Trust Company here drawn in question is founded on five promissory notes, all dated subsequently to testator's decease, aggregating $9,875, signed by Mary E. McAusland to the order of "Columbia Ice Cream Company," and indorsed, "Columbia Ice Cream Company, Mary E. McAusland, Proprietress." These took the place of notes originally signed by John McAusland, outstanding at the time of his death, to the order of the "Columbia Ice Cream Company," and indorsed, "Columbia Ice Cream Company, John McAusland, Proprietor." As between the parties to the original indebtedness, the acceptance of a note or any number of renewals for such indebtedness does not discharge it, in the absence of a clear intention so to do. This matter of intention is the controlling factor, and is usually a question to be determined by the facts of each particular case. While the burden of proof to show novation is usually on the debtor alleging it, in the present instance, that burden has been shifted to the claimant, inasmuch as the notes so signed and indorsed by the bankrupt are prima facie evidence of a contract only with her. The trust company contends that these notes of the bankrupt were but a continuance of the testator's indebtedness; that they were replacements, so called because under the laws of New Jersey a trust company cannot discount commercial paper. As each of these notes of the decedent came due a note, in the form signed and indorsed by the bankrupt as aforesaid, was executed and purchased by the trust company. The proceeds were credited to the account of the Columbia Ice Cream Company, the business of which was then carried on by the bankrupt, and the amount of testator's notes so replaced was debited to said account. The old notes were stamped "paid," and, subsequently, when the account was balanced, were, with other vouchers and passbooks, turned over to bankrupt. Replacements of this character occurred several times between the death of John McAusland and the

filing of the petition in bankruptcy; the notes underlying the present claim being those last executed by the bankrupt.

In explanation of why these replacements were made and how the old notes were stamped "paid" and returned to the bankrupt, Edwin M. Farrier, the president of the trust company, testified that shortly after John McAusland's death, the bankrupt called on him with reference to the decedent's indebtedness, and in response to her inquiry what the bank intended to do regarding it, he told her that:

"A. * * * It was not the time to do anything just yet; that the bank had no disposition to crowd her, and that the matter could be worked out— words to that effect. Q. Was anything then said about extending the time for paying these obligations? A. Yes. Q. What did you say about that? A. To the best of my recollection, it was that the time of payment be extended; that we had no disposition to crowd her. Q. Nothing more specific than that? A. No, sir."

Nothing was said by him indicating that the new notes were taken as collateral security for those of the testator, or that his notes were to be retained as evidence of his indebtedness to the trust company, nor anything indicating the latter's intention to hold the decedent's estate for the payment of said indebtedness. Nor was anything done from which it could be inferred that the estate of the testator was still to be looked to for the payment of said notes. Much, however was done tending to support a contrary understanding, viz. the testator's notes were stamped "paid" and returned to the bankrupt; the respective amounts of such notes were debited to the account increased by crediting the proceeds of the new notes made by her, and no claim was ever presented to, or filed with, the executrix of her husband's estate. The trust company knew that she claimed to be the owner and was exercising the power of proprietress over the business theretofore carried on by her husband. The trust company had theretofore loaned the testator money while conducting that business. By his last will the widow was now the owner and desirous of continuing it. She, with reference to his estate, except as to personal liabilities for his indebtedness, was in his place. She was given all he had, subject to the payment of his debts, and upon giving the notes to the trust company she became as personally liable for their payment as her husband had been on the old notes. From all the evidence, bearing upon the relationship existing between this creditor and the bankrupt, that began with the interview referred to, it is clear that it accepted her in place of her husband for this indebtedness. The argument that it is not to be assumed that a creditor intends to surrender a security for his claim and rely solely upon the personal responsibility of another has no force in the face of the facts of the instant case.

Whether the trust company knew that the lands of the decedent were subject to a lien in favor of his creditors, as distinguished from a liability to be sold to pay the same, is not disclosed. But assuming that it had such knowledge, there is nothing in the circumstances of its taking new notes from the bankrupt, when read in the light shed thereon by the interview referred to and its subsequent conduct in relation to the old notes to the decedent's estate and the business venture of the bankrupt, that negatives the idea that it had abandoned its

claims against the testator, and was looking solely to the bankrupt for the payment of such indebtedness.

The trust company's attitude toward the bankrupt was one of lieniency and helpfulness, but it was toward her individually as owner of the property, and not as executrix acting in a representative capacity in the interests of her husband's estate. The trust company did nothing to preserve its claims against the testator's estate, or even to indicate that it still looked to it for the payment of said debt. It treated her as owner of his estate and accepted her individual responsibility in place of the deceased for such indebtedness. In respect to the consequences of its attitude in relation to such indebtedness, it is in the same situation as those who dealt with the bankrupt while she was carrying on her business. It, like they, must look to the bankrupt's estate for the payment of the debts which she individually contracted or assumed. The prima facie case made by the new notes, which on their face show only individual liability on the part of the bankrupt, has not been overcome by the testimony; in fact it has been strengthened thereby. The trust company is therefore excluded from the class of creditors having priority, and must take its place with those who have only the assets of the bankrupt to look to.

The trust company's additional appeal from the referee's decision, denying its claim to be subrogated to the lien for taxes said to have been paid from moneys borrowed from it by the bankrupt for such purpose, is likewise not sustained, as there is no evidence that any part of the moneys thus borrowed were used for such purpose.

[17] The New Jersey Title Guarantee & Trust Company's appeal challenges the decision of the referee disallowing its claim for deficiency resulting from the foreclosure sale of one of the testator's premises mortgaged to it. It claims a right to participate in the fund under consideration. Claimant was the holder of the bond of John McAusland for $20,000, secured by a mortgage covering No. 90 Montgomery street, one of the premises of which he dies seised. Those premises were sold to the claimant January 22, 1914, in proceedings to foreclose said mortgage begun October 13, 1913. The sale did not net sufficient to pay claimant's decree by the sum of $7,618.30.

The referee concluded that this claim was disentitled to any standing against the bankrupt's estate, giving as his reasons that the title company was estopped from asserting any priority because of its failure to respond to the referee's order to show cause why the property of the bankrupt should not be sold free, clear, and discharged of all incumbrances thereon; that by its purchase of the mortgaged premises it obtained property of greater value than the amount of its mortgage, interest, and cost, and that its claim for deficiency under the New Jersey Statutes could not be against Mary E. McAusland's estate in bankruptcy, but solely against John McAusland's estate, and enforceable only by an action against his personal representative founded on his bond; and that as this was not done, such claim had no standing whatever in the bankruptcy proceedings.

The referee's order to show cause, which was not responded to by

this claimant, is dated July 7, 1913, and is prior to the date of sale of the mortgaged premises. Its only interest in the sale of the testator's lands affected by said order was the possible one of its debt not being satisfied through the sale of said mortgaged premises. At the date of said order its claim for deficiency had but a potential existence, and no estoppel occurred by its failure to respond to such order. It did respond to an order subsequently made by the referee on July 14, 1914, directly challenging its right to participate in the bankrupt's funds by reason of said claim for deficiency, and it is the referee's decision in that order, and not the one mentioned by the referee, that is attacked by this appeal; and as to that, it is under no disability to prosecute a review.

As to the referee's further reason that the claim for deficiency could only be enforced against the personal representative of John McAusland, deceased, etc., and the additional contentions of the trustee that claimant's failure to file a claim with the executrix of said decedent, and to surrender its security and file a claim for the whole amount of the bond with the referee, estops it from claiming anything from the estate in bankruptcy: At the time of the sale of the mortgaged premises a decree to bar the creditors of John McAusland from any action against the executrix had been entered in the probate court, and the legal title to all the property of the decedent, which came to her by the will of her husband, and undisposed of by her, had passed to the trustee.

[18, 19] The failure of a creditor of the decedent to present a claim to the executrix before the entry of the decree to bar creditors, or before she is adjudged a bankrupt, would not prevent such creditor from following the real estate thus in her hands, or that had passed to the trustee. The right to proceed under the Heirs and Devisees Act, supra, or to enforce the equitable liens arising under the testator's will, was unaffected by such decree, or the passing of the legal title to the trustee in the course of bankruptcy proceedings. The method of procedure and the forum in which to bring such proceedings, however, was changed by the filing of the petition in bankruptcy. From that time on the enforcement of such charge upon said land could be secured only in the bankruptcy courts, and no suit was necessary for such purpose. Those creditors who began suits to enforce such charge in the New Jersey courts, as already noted, were restrained from continuing such proceedings, and required to prove their rights to such charges before the referee, and the creditors who did not so sue, are not to be prejudiced for not endeavoring to do what they would not have been permitted to accomplish. To hold otherwise would be to make a farce of legal proceedings.

[20] If the deficiency had arisen before the intervention of bankruptcy proceedings, in order to recover the same, a suit on the bond would have been necessary under the New Jersey statute, approved March 12, 1880, entitled:

"An act concerning proceedings on bonds and mortgages given for the same indebtedness and the foreclosure and sale of mortgaged premises thereunder." 3 N. J. Comp. Stat. p. 3420.

The filing of the petition in bankruptcy, however, created a situation not contemplated by that statute, nor controlled by state legislation. Upon the appointment of a trustee in such proceedings, the legal title to the property at one time owned by the decedent, and subsequently by his testamentary beneficiary, passed to said trustee; and as such property was in his possession, it could only be administered by him in the bankruptcy courts. The real estate thus passing to the trustee, however, as already observed, was subject to said equitable liens in favor of decedent's creditors, and such liens were enforceable in the said court.

Upon the presentation of the claims of decedent's creditors seeking to enforce them against said real estate or the proceeds thereof, the referee obtained jurisdiction to determine the status and merits of such claims. Under the state statute last mentioned, to recover deficiency arising on the sale of mortgaged premises, a suit on the obligors' bond would have to be brought within six months after the sale. Upon the recovery of judgment for such deficiency the sale was opened, and the judgment debtor, by paying the full amount of such mortgage debt and costs within six months after such judgment was rendered, could redeem said premises. Upon the intervention of bankruptcy proceedings the presenting of the claim for deficiency in the bankruptcy court takes the place of the suit required by the New Jersey statute, and as the one under consideration was presented within six months after such sale, the claimant is not only entitled, but constrained, if he insists upon a recovery, to have his claim for deficiency adjudicated in the bankruptcy court.

As to the objections which go to the merits of this claim:

[21] First. It is contended that the mortgage creditor was required to elect either to rely on his security, or to surrender it, and file his claim for the whole amount of the debt. Under section 57, subsections "a" and "h," of the Bankruptcy Act, as construed by the courts, when the trustee does not elect to redeem by paying the debt, a secured creditor, having the right to sell the security, is not required, in the first instance, to so elect, but he may sell the security and file a claim for the unpaid remainder of his debt. In re Peacock (C. C.) 178 Fed. 851, 24 Am. Bankr. Rep. 159; British & American Mortgage Co. v. Stuart, 210 Fed. 425, 127 C. C. A. 157, 31 Am. Bankr. Rep. 544. See, also, the following text-books on Bankruptcy: Collier (10th Ed.) 57c3, p. 726; Black, p. 1194; Loveland, p. 697; and Remington, p. 621. This was the course pursued by this claimant. Its mortgage was foreclosed and the proceeds of the sale credited on account of the bond and the claim filed for the remainder.

[22, 23] Second. As to the value of the property bought in by claimant in enforcing its security. In the absence of a legal rule in the state making the sum for which the property is bought in at a public sale conclusive as to its value, the bankruptcy court, on allegation of inadequate price realized at such a sale is by duty bound to consider the question of value. In re Davis (3 C. C. A.) 174 Fed. 556, 98 C. C. A. 338; In re Dix (D. C.) 176 Fed. 582; In re Peacock (C. C.) 178 Fed. 851, 860; In re Graves (D. C.) 182 Fed. 443.

There is no such rule in New Jersey, but, on the contrary, the price brought by property at such a sale is no criterion whatever of its value. Martinett v. Maczkewcz, 59 N. J. Law, 11, 35 Atl. 662; Holcombe v. Trenton White City Co., 80 N. J. Eq. 122, 82 Atl. 618, affirming Id., 82 N. J. Eq. 364, 91 Atl. 1069.

[24] The proof of claim in the present instance showing that claimant on a sale of the property mortgaged as security for its debt bought in the property, the burden is, on it to show that said property was of insufficient value to pay its debts. The only effort made by claimant to discharge such burden was a showing that the highest bid obtained on a public sale of such property was $14,000. There was but one other bid, and that was for $12,000. But that, as was held in Martinett v. Maczkewcz, supra, is not even admissible as evidence of value. In that case the trial court refused to admit such evidence. On error it was said by Chief Justice Beasley, 59 N. J. Law, 14, 35 Atl. 663:

"In inquiries of this nature it has been customary to show the market value of the property if it has a fixed rate of that kind, and, if it has no such estimation, to prove its value by the opinion of experts and by an exposition of the state and condition of the things sold. In such an inquisition the price obtained at a sheriff's sale would seem to be wholly valueless. When a willing seller and a willing buyer agree and fix the price of an article, it is obvious that it is reasonable to infer that such estimation approximates closely to the real value of such article; but in an official sale by auction the owner has no voice in the affair, and each bidder is striving to obtain the thing sold, not at its actual worth, but at a bargain. It is vain to deny, for all experience attests the fact, that, as a general thing, the attendants at a public auction of personal property are there with the expectation of acquiring the articles purchased much below their cost in the market. It is deemed that, as criteria of real value, such transactions can have no effect except to mislead."

This was quoted with approval and applied by V. C. Walker (now Chancellor) in Holcombe v. Trenton White City Co., supra; and, as his opinion was adopted as that of the Court of Errors and Appeals in affirming the latter decision, it must be accepted as the settled rule in New Jersey that the price which a property brings at sheriff's sale is at least not conclusive as to the value, notwithstanding some earlier cases seemingly adopted a different rule. Hiscock v. Varick Bank, supra, enunciates no contrary doctrine. In that case Mr. Chief Justice Fuller said (206 U. S. 39, 27 Sup. Ct. 684, 51 L. Ed. 945):

"The trustee did not offer to prove * * * that the policies had a greater value than was realized at the sale."

The inference is, therefore, that, in that learned justice's opinion, the question of value is one that may arise whenever a deficiency on sale is sought to be recovered. In the present case the trustee proved that the mortgaged premises were fully worth all of the mortgagee's debt, principal, interest, and costs, and the mortgagee offered no contrary evidence, but relied upon the fact that the property was struck off at a bid less than two-thirds of the value put on it by Wolbert, the real estate expert, which, according to the cited New Jersey Case, is not even admissible as evidence of value. In re Davis, supra, to a like contention that Hiscock v. Barick Bank was authority for a

contrary view, Judge McPherson speaking for the Court of Appeals said (174 Fed. 561, 98 C. C. A. 343):

"In that case insurance policies were pledged as collateral security, under an agreement which authorized the pledgee to sell without notice and to buy at his own sale; the pledgor expressly agreeing to 'remain liable for any deficiency arising upon such sale.' The securities were, accordingly bid in by the pledgee at a bona fide sale, credit was given for the price, such price being found by the Supreme Court to be adequate, and proof of the balance of the debt was allowed against the bankrupt estate. There is no suggestion in the case that any such question as is now presented was raised at any stage of the proceedings, or was considered by the Supreme Court, and, in view of the pledgor's express agreement to be liable for any deficiency arising upon the sale, it is difficult to see how the question could possibly have been involved."

But, if the law were otherwise, and the burden of proof were upon the trustee or objecting creditors to show that such price was inadequate, such burden has been fully met by the evidence introduced to sustain their objection to this claim.

Frederick C. Wolbert, a real estate broker and auctioneer called by the trustee as an expert on the values of real estate in the vicinity of the mortgaged premises, and who had acted as one of the official appraisers of the bankrupt's estate in 1913, testified on October 8, 1914, before the referee that, in his opinion, such property was worth $23,000. Daniel E. Evarts, the first vice president of the claimant, testified that after the sale the building had been insured by it for $15,-000. In response to questions propounded by the counsel for the trustee, with reference to this insurance and the value of the land where such building stood, he said:

"Q. Did you insure that building, Mr. Evarts, for more than what you thought it was worth? A. No; we got to insure it for 80 per cent. Q. What did you consider that lot worth? A. It is a pretty hard proposition now; you would have to give me something easier than that. Q. Do you consider it worth at least $5,000? A. Oh, yes; no question about that. Q. Do you consider it worth $10,000? A. That I am not prepared to say."

[25] If these premises were of less value than that testified to by Wolbert or indicated by the testimony of Evarts, the claimant could have introduced evidence showing what the market value was. This failure so to do raised the presumption that the property was well worth the amount of the claimant's debt and justified the referee in so holding and rejecting its claim. The offer of the claimant to turn over the purchased property to the trustee on being paid the full amount of his claim is immaterial. The trustee is not in a position to redeem, assuming that he has authority so to do. See In re Graves, supra.

[26, 27] The only other question that needs to be considered on these reviews is whether the creditors given priority are entitled to interest on their respective claims. The referee held that they were entitled to interest only to the time of the death of John McAusland, basing his conclusion on what he understood to be the law and practise of the orphans' courts throughout the state. He cited no authorities, and the record fails to show what the practise in such courts is on that matter. On behalf of the creditors, it is objected that there is no such

law and practise. If these claims, under consideration, were strictly against the assets of the bankrupt, interest would be allowable only up to the time of filing the petition in bankruptcy. See Bankruptcy Act, 63a(1); Comp. St. 1913, § 9647. Sexton v. Dreyfus, 219 U. S. 339, 31 Sup. Ct. 256, 55 L. Ed. 244; Board of County Commissioners v. Hurley, 169 Fed. 92, 96, 94 C. C. A. 362; In re Chandler, 184 Fed. 887, 107 C. C. A. 209.

These claims, however, as noted, are not against the bankrupt, but against her deceased husband's estate, and chargeable against the property she took as his devisee. The proceeds derived from the sale made by the trustee of said decedent's real estate is more than sufficient to pay the principal of his unpaid debts. The rule in bankruptcy that interest stops with the filing of the petition has no application to solvent estates (Johnson v. Norris, 190 Fed. 459, 111 C. C. A. 291, L. R. A. 1915B, 884), and no good reason appears why the interest on the decedent's indebtedness should stop either at the time of the death of John McAusland or upon the filing of the petition in bankruptcy. Before the filing of said petition the bankrupt enjoyed the use of such real estate, using some of its income in the payment of his and her debts. Since that event said income has been taken by the receiver or trustee. In my opinion, the interest should be allowed until the time of the sale of such property. If the proceeds derived from such sale should prove insufficient to pay the principal and interest of said claims, they should prorate therein.

The result is that the referee's findings brought up on these petitions for review are affirmed, save as to question of interest. A decree in conformity to this opinion may be entered.